786 So.2d 532 (2001)
Gregory MILLS, Petitioner,
v.
Michael W. MOORE, etc., Respondent.
No. SC01-338.
Supreme Court of Florida.
April 12, 2001.
*533 Todd G. Scher, Litigation Director, Capital Collateral Regional Counsel, Fort Lauderdale, FL, for Petitioner.
Robert A. Butterworth, Attorney General, and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, FL, for Respondent.
PER CURIAM.
Gregory Mills, a prisoner under sentence of death, petitions this Court for writ of habeas corpus. We have jurisdiction. Art. V, § 3(b)(9), Fla. Const. We deny Mills' petition for writ of habeas corpus for the reasons that follow.

Factual and Procedural History
In 1979, Petitioner was convicted of felony murder, aggravated battery, and burglary. The facts set forth by this Court in the opinion on direct appeal are as follows:
The evidence at the trial showed that Gregory Mills and his accomplice Vincent Ashley broke into the home of James and Margaret Wright in Sanford between two and three o'clock in the morning, intending to find something to steal. When James Wright woke up and left his bedroom to investigate, Mills shot him with a shotgun. Margaret Wright awakened in time to see one of the intruders run across her front yard to a bicycle lying under a tree. Mr. Wright died from loss of blood caused by multiple shotgun pellet wounds.
Ashley, seen riding his bicycle a few blocks from the Wright home, was stopped and detained by an officer on his way to the crime scene. Another officer saw a bicycle at the entrance to a nearby hospital emergency room, found Mills inside, and arrested him. At police headquarters officers questioned both men and conducted gunshot residue tests on them. They were then released.
At trial Mills' roommate testified that he and his girlfriend hid some shotgun shells that Mills had given them, that Mills had been carrying a firearm when he left the house the night of the murder, and that Mills had said he had shot *534 someone. He also stated that Mills told him that a city worker had found a shotgun later shown to have fired an expended shell found near the victim's home.
After the murder, Ashley was arrested on some unrelated charges. He then learned that Mills had told his roommate and his girlfriend about the murder and that they in turn had told the police, so he decided to tell the police about the incident. Ashley testified that Mills entered the house (through a window) first, that he, Ashley, then handed the shotgun in to him, and that he then entered the house himself. Ashley saw that the man in the house had awakened and was getting up, so he exited the house and ran to his bicycle. Then he heard the shot and ran back to the house, where he saw Mills. They both departed the scene on their bicycles, taking separate routes. Ashley was granted immunity from prosecution for these crimes and also for several unrelated charges pending against him at the time he decided to confess and cooperate.
Mills testified in his defense. He said that he arrived home from work on May 24 at about 9:30 p.m. Then he went out, first to one bar, then another, playing pool and socializing. He went home afterwards but could not sleep, he said, because of a toothache and a headache, so he went to the hospital emergency room. There police officers took him into custody.
Mills v. State, 476 So.2d 172, 174-75 (Fla. 1985). After finding Mills guilty of first-degree murder, burglary, and aggravated battery, and with the knowledge that the State granted immunity to Mills' codefendant Ashley who testified against Mills, the jury recommended a sentence of life imprisonment.
Before sentencing Mills the trial court ordered and considered a presentence investigation. The trial court, the State, and Mills were provided copies of the presentence investigation report in January, 1980. In April, 1980, before sentencing, the trial court heard further presentations from the parties regarding the appropriate sentence.
At trial, the jury heard evidence of four aggravators: (1) that the crime was committed by a person under a sentence of imprisonment; (2) that Mills had a previous conviction of a violent felony (aggravated assault); (3) that the murder was committed in the course of a felony based on the contemporaneous conviction for burglary and (4) that the murder was heinous, atrocious, or cruel (HAC). After the presentence hearing, however, the trial judge found six aggravating factors, including two that were not argued by the State to the jury: (1) that the murder involved great risk of death to many persons; and (2) that the murder was committed for pecuniary gain.
On direct appeal, we struck three of the aggravators: great risk of death to many persons (State conceded it was improper); pecuniary gain (because of improper doubling based on the burglary conviction); and heinous, atrocious or cruel (because we could not reconcile this aggravator with Teffeteller v. State, 439 So.2d 840 (Fla. 1983), which was the same factual situation and in which HAC was not found). See Mills v. State, 476 So.2d 172, 178 (Fla. 1985). However, we affirmed the death sentence based upon the three remaining aggravators (all of which the jury considered).
We affirmed the trial court's jury override and specifically found that the jury override in this case met the requirements of Tedder v. State, 322 So.2d 908 (Fla.1975) (a jury's recommendation of life should be *535 given great weight and should be followed unless the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ). We said:
We hold that the trial judge's findings in support of the sentence of death even without the finding of especially heinous, atrocious and cruel, meet the Tedder standard. We find that the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ. There are three valid statutory aggravating circumstances, and the trial judge has found there are no valid mitigating circumstances. The purported mitigating circumstances claimed by Mills, but not found by the trial judge, are not sufficient to outweigh the aggravating circumstances nor do they establish a reasonable basis for the jury's recommendation. We conclude that the imposition of a sentence of death after a jury recommendation of life was proper in this case.
Mills, 476 So.2d at 179.
The trial court summarily denied Mills' first petition for postconviction relief, and we reversed and remanded for evidentiary hearing. Mills v. Dugger, 559 So.2d 578 (Fla.1990). The trial court held an evidentiary hearing and again denied postconviction relief, and Mills appealed. Mills argued that trial counsel was ineffective for failure to develop and present evidence regarding statutory and nonstatutory mental health mitigators. We agreed with the trial court that trial counsel did not fall short of the standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for effectiveness of counsel and said:
"A defendant's mental condition is not necessarily at issue in every criminal proceeding." Ake v. Oklahoma, 470 U.S. 68, 82, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985). None of Mills' original attorneys had any idea that his mental health might be at issue. Current counsel's getting those attorneys to admit that they would, today, routinely pursue evidence for the mental health mitigators illustrates the Supreme Court's concern "that every effort be made to eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. "That current counsel, through hindsight, would now do things differently than original counsel did is not the test for ineffectiveness." Stano v. State, 520 So.2d 278, 281 n. 5 (Fla.1988).
Mills v. State, 603 So.2d 482, 485 (Fla. 1992). Mills then petitioned for a writ of habeas corpus, which was denied on procedural grounds. Mills v. Singletary, 606 So.2d 622 (Fla.1992). He then filed a petition for a writ of habeas corpus in federal court. The Eleventh Circuit Court of Appeals presented a detailed procedural history of this case in Mills v. Singletary, 161 F.3d 1273, 1278-80 (11th Cir.1998). In short, we affirmed Mills' convictions and death sentence on direct appeal, 476 So.2d 172, denied his state habeas petition and reversal of denial of his state petition for postconviction relief, 559 So.2d 578, affirmed the second denial of his state petition for postconviction relief, 603 So.2d 482, and denied his state petition for extraordinary relief and for writ of habeas corpus, 606 So.2d 622. Thereafter, Mills sought federal habeas relief. The United States District Court for the Middle District of Florida, No. 92-1184-Civ-ORL-19, Patricia C. Fawsett, J., denied the petition. Mills appealed. Mills v. Singletary, 161 F.3d 1273 (11th Cir.1998). The Eleventh Circuit Court of Appeals affirmed the denial *536 of federal habeas relief. Id.[1]
On March 27, 2001, Mills filed the instant petition for writ of habeas corpus. Mills makes two arguments: (1) Florida's death penalty override scheme, under which Mills was sentenced to death, violates the principle espoused in the recent decision by the United States Supreme Court in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and therefore violates the United States and Florida constitutions; and (2) this Court's recent decision in Keen v. State, 775 So.2d 263 (Fla.2000), indicates Tedder was arbitrarily applied in this case.

The Apprendi Issue
In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),[2] the Supreme Court announced the general rule that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id., 120 S.Ct. at 2362-63. The Court specifically stated in the majority opinion that Apprendi does not apply to already challenged capital sentencing schemes that have been deemed constitutional. The Court stated:
Finally, this Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death. For reasons we have explained, the capital cases are not controlling:
"Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed.... The person who is charged with actions that expose him or her to the death penalty has an absolute entitlement to jury trial on all the elements of the charge."
Id., 120 S.Ct. at 2366 (citations omitted). And one justice, in a separate concurring opinion, indicated that issue was left to be decided in the future. Id., 120 S.Ct. at 2380 (Thomas, J. concurring).
The Court was referring to its earlier decision in Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), wherein it addressed a capital sentencing scheme and held that the presence *537 of an aggravating circumstance in a capital case may constitutionally be determined by a judge rather than a jury. Id. at 647-48, 110 S.Ct. 3047.[3] Because Apprendi did not overrule Walton, the basic scheme in Florida is not overruled either.
Mills argues that Apprendi overruled Walton and relies upon the five-to-four split in the Court. Four justices stated in dissent that Apprendi effectively overruled Walton, and another justice in his concurring opinion stated that reconsideration of Walton was left for another day. With the majority of the justices refusing to disturb the rule of law announced in Walton, it is still the law and it is not within this Court's authority to overrule Walton in anticipation of any future Supreme Court action. The Supreme Court has specifically directed lower courts to "leav[e] to this Court the prerogative of overruling its own decisions." Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (quoting Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). The majority opinion in Apprendi forecloses Mills' claim because Apprendi preserves the constitutionality of capital sentencing schemes like Florida's. Therefore, on its face, Apprendi is inapplicable to this case.
No court has extended Apprendi to capital sentencing schemes, and the plain language of Apprendi indicates that the case is not intended to apply to capital schemes. See State v. Hoskins, 199 Ariz. 127, 14 P.3d 997, 1016 (2000) (noting Apprendi did not apply to capital sentencing schemes and did not overrule Walton); Weeks v. State, 761 A.2d 804, 806 (Del. 2000) (en banc) ("[W]e are not persuaded that Apprendi's reach extends to `state capital sentencing schemes' in which judges are required to find `specific aggravating factors before imposing a sentence of death.'"), cert. denied, ___ U.S. ___, 121 S.Ct. 476, 148 L.Ed.2d 478 (2000); State v. Golphin, 352 N.C. 364, 533 S.E.2d 168, 193-94 (2000) ("The United States Supreme Court's recent opinion in Apprendi... does not affect our prior holdings regarding the inclusion of aggravating circumstances in an indictment.... [A]n indictment need not contain the aggravating circumstances the State will use to seek the death penalty ...."), cert. denied, ___ U.S. ___, 121 S.Ct. 1379, 149 L.Ed.2d 305 (2001). Importantly, in Weeks v. Delaware, a capital defendant brought his second habeas petition on October 27, 2000, alleging an Apprendi violation and seeking a stay of his execution which was set for November 17, 2000. The trial court ruled that Apprendi did not apply to Weeks' case. Weeks appealed and the trial court's ruling was affirmed. On November 16, 2000, just one day before the scheduled execution, the United States Supreme Court denied certiorari. Weeks v. Delaware, ___ U.S. ___, 121 S.Ct. 476, 148 L.Ed.2d 478 (2000). The Supreme Court's denial of certiorari indicates that the Court meant what it said when it held that Apprendi was not intended to affect capital sentencing schemes.
Mills makes two additional arguments that are fact-specific to his case. First, he argues that the statute in effect at the time of the initial trial made the maximum penalty for his crime life imprisonment. Only after the jury verdict and further sentencing proceedings, Mills argues, could death be a possible sentence. *538 This particular scheme, Mills argues, puts the sentence of death outside of the maximum penalty available and triggers Apprendi protection.
With regard to the statute in effect at the time of trial, Mills cites section 775.082(1), Florida Statutes (1979), which provided:
A person who has been convicted of a capital felony shall be punished by life imprisonment and shall be required to serve no less than 25 years before becoming eligible for parole unless the proceeding held to determine sentence according to the procedure set forth in s. 921.141 results in finding by the court that such person shall be punished by death, and in the latter event such person shall be punished by death.
§ 775.082(1) Fla. Stat. (1979). Mills argues that this statute makes life imprisonment the maximum penalty available. Mills argues that the statute allowing the judge to override the jury's recommendation makes it clear that the maximum possible penalty is life imprisonment unless and until the judge holds a separate hearing and finds that the defendant is death eligible.
The plain language of section 775.082(1) is clear that the maximum penalty available for a person convicted of a capital felony is death. When section 775.082(1) is read in pari materia with section 921.141, Florida Statutes, there can be no doubt that a person convicted of a capital felony faces a maximum possible penalty of death.[4] Both sections 775.082 and 921.141 clearly refer to a "capital felony." Black's Law Dictionary defines "capital" as "punishable by execution; involving the death penalty." Black's Law Dictionary 200 (7th ed.1999). Merriam Webster's Collegiate Dictionary defines "capital" as "punishable by death ... involving execution." Merriam Webster's Collegiate Dictionary 169 (10th ed.1998). Therefore, a "capital felony" is by definition a felony that may be punishable by death. The maximum possible penalty described in the capital sentencing scheme is clearly death.
Mills is actually attacking the validity of the bifurcated guilt and sentencing phases of a capital trial. That issue was litigated and decided in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). The Apprendi majority clearly did not revisit these rulings.
As for Mills' second argument, Mills argues that the trial judge actually considered additional aggravating factors not presented to the jury. This consideration, Mills argues, violates Apprendi's requirement that the jury be the trier of fact for all elements of the crime charged.
First, any error that might have occurred when the trial judge considered evidence that the jury did not hear would be harmless in this case because the additional aggravators that the trial judge found were struck by this Court on direct appeal and not considered in any way when we affirmed the death sentence on *539 direct appeal. Furthermore, the evidence supporting the pecuniary gain aggravating factor was in fact heard by the jury because it was based on Mills' contemporaneous burglary conviction.
The essence of this argument was raised and decided on direct appeal. Mills argued on direct appeal that the State's presentation of evidence on two additional aggravators invalidated the judge's override.[5] On direct appeal as to the penalty phase, Mills challenged the constitutionality of Florida's capital felony sentencing law, argued that the court found improper aggravating circumstances, argued that the trial court failed to consider certain mitigating evidence, and argued that the trial court failed to give appropriate consideration to the jury's recommendation of life imprisonment. Mills, 476 So.2d at 177-79. In his brief on direct appeal, Mills argued that the State may not reserve additional evidence for the judge's consideration alone after the jury's recommendation. Relying on Presnell v. Georgia, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978), Mills argued that as a matter of due process, he was entitled to have the existence and validity of aggravating circumstances determined as they were placed before the jury. To allow a "postjury" determination of aggravating circumstances would deprive him the right of due process and deny him his right to trial by jury. Mills also argued that post-jury determinations of aggravating circumstances would destroy the trifurcated sentencing procedures then in place.
Although we did not address this argument with specificity in Mills' direct appeal, we did address Mills' broader claim that the trial court failed to give appropriate consideration to the jury's recommendation of life imprisonment. On this claim we stated the issue was properly evaluated under Tedder. See Mills, 476 So.2d at 179. Mills' second Apprendi claim, although framed a different way, was raised and decided on direct appeal. It is therefore procedurally barred. See Harvey v. Dugger, 656 So.2d 1253 (Fla.1995); Rivera v. Dugger, 629 So.2d 105 (Fla.1993); Mendyk v. State, 592 So.2d 1076 (Fla.1992).

The Tedder/Keen Issue
Mills' second argument is that Tedder v. State, 322 So.2d 908 (Fla.1975), which allows the trial judge to override a jury recommendation in capital cases, was arbitrarily applied in this case based on the language used in Keen v. State, 775 So.2d 263 (Fla.2000). In Tedder we said, "In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Id. at 910. In Keen, on the defendant's direct appeal following his third trial, we applied the Tedder analysis. In applying Tedder we emphasized the fact that a trial court's analysis in an override situation should focus on the record evidence supporting the jury's recommendation and should not be the same weighing process that is used when the jury recommends death.
While conceding that Keen is not new law, Mills nonetheless argues that *540 Keen's application of Tedder constitutes a new standard by which jury override cases are reviewed. Keen is not a major constitutional change or jurisprudential upheaval of the law as it was espoused in Tedder. Keen offers no new or different standard for considering jury overrides on appeal. Thus, we disagree with Mills' contention that Keen offers a new standard of law and we reject the contention that Keen was anything more than an application of our long-standing Tedder analysis.
Tedder is the seminal case in Florida on jury overrides and remains so after Keen. Tedder was applied to this case. Keen provides no basis for our reconsideration of this issue. For these reasons, we deny Mills' petition for writ of habeas corpus.
It is so ordered.
WELLS, C.J., and HARDING, LEWIS and QUINCE, JJ., concur.
HARDING, J., concurs with an opinion, in which WELLS, C.J., and LEWIS and QUINCE, JJ., concur.
ANSTEAD, J., dissents with an opinion, in which SHAW and PARIENTE, JJ., concur.
PARIENTE, J., dissents with an opinion, in which SHAW and ANSTEAD, JJ., concur.
HARDING, J., concurring.
I concur with the majority opinion. As pointed out in that opinion, Mills' sentence has been reviewed and affirmed on several different occasions by several different courts. Yet, in an attempt to bolster their argument, the dissenting justices on the present panel rely on views expressed by dissenting justices from previous panels that considered this case. While I respect the opinions of those justices, their dissenting opinions are just thatdissenting opinions; the positions expressed in those opinions did not carry the day. Hence, such opinions have no precedential value. But according to dissenters on the present panel, this Court should completely disregard all previous precedent in this case and instead adopt the views of past dissenters. They rely on the familiar idiom that "death is different" in order to justify abandoning the fundamental judicial principle of stare decisis.
Pursuant to the authority granted under the Florida Constitution, this Court is often called upon to interpret the law. However, it is not the function of this Court to make new law on a case-by-case basis in order to reach a desired result. Once the law has been established by this Court, it is our responsibility to apply that law uniformly in all cases, regardless of the status of the players or the stakes of the game. This adherence to the rule of law allows the judiciary to fulfill its obligation of providing stability and certainty for the citizens of this state. Only in rare circumstances should precedent be overturned or subsequent changes be applied retroactively. This is not such a case. The facts of this case clearly support the conviction of first-degree murder and sentence of death. No manifest injustice will result from the denial of Mills' petition for a writ of habeas corpus.
WELLS, C.J., and LEWIS and QUINCE, JJ., concur.
ANSTEAD, J., dissenting.
A life hangs in the balance while this Court considers whether it should openly acknowledge its past mistake. In my view the choice is obvious while we still have time. A jury has lawfully determined that Mr. Mills' life should be spared. We are now called upon to recognize that a trial court wrongfully ignored the jury's decision and this Court erroneously approved *541 of that action. No one disputes that a mistake was made. Under our holding in Keen v. State, 775 So.2d 263 (Fla.2000), and countless other decisions properly applying the Tedder rule, it is apparent that there was a reasonable basis for the jury's decision to spare Mills' life and we should not hesitate to say so now. For example, in both Keen and Mills, the jury was entitled to rely on the more lenient treatment of a codefendant as a valid reason to recommend life. However, under our ruling today, Mills will die while Keen will live.
In the past this Court has been quick to accept responsibility for its mistakes, especially if blind adherence to a flawed decision will result in a manifest injustice and the taking of a human life. See, e.g., Proffitt v. State, 510 So.2d 896 (Fla.1987).[6] After all, we have consistently said that death is different. Today I fear the Court has deviated from that course in rejecting a plea for mercy based upon this Court's mistake in Mills' case in not properly applying the rule of law set out in Tedder v. State, 322 So.2d 908 (Fla.1975), which first announced that a jury's recommendation of life must be honored when there is any reasonable basis for the jury's action.[7]
At the time of Mills' direct appeal, the law pertaining to a trial court's authority to void a jury decision for life was unclear and conflicting, often leading to patently inconsistent outcomes in this Court. However, in 1989 this Court openly conceded its prior erroneous and inconsistent application of Tedder:
Finally, we agree with the dissent that "legal precedent consists more in what courts do than in what they say." However, in expounding upon this point to prove that Tedder has not been applied with the force suggested by its language, the dissent draws entirely from cases occurring in 1984 or earlier. This is not indicative of what the present court does, as Justice Shaw noted in his special concurrence to Grossman v. State, 525 So.2d 833, 851 (Fla.1988) (Shaw, J., specially concurring):

*542 During 1984-85, we affirmed on direct appeal trial judge overrides in eleven of fifteen cases, seventy-three percent. By contrast, during 1986 and 1987, we have affirmed overrides in only two of eleven cases, less than twenty percent. This current reversal rate of over eighty percent is a strong indicator to judges that they should place less reliance on their independent weighing of aggravation and mitigation.
Clearly, since 1985 the Court has determined that Tedder means precisely what it says, that the judge must concur with the jury's life recommendation unless "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ." Tedder, 322 So.2d at 910.
Accordingly, we affirm the judgment of guilt, but vacate the sentence of death with directions that appellant be sentenced to life imprisonment.
Cochran v. State, 547 So.2d 928, 933 (Fla. 1989). Of course, Mills' case was "among those cases occurring in 1984 or earlier" in which this Court had not applied Tedder with "the force suggested by its language."
Under the rule announced in Cochran and as definitively explained in Keen, this Court dramatically shifted its focus and has subsequently rigidly applied the Tedder rule and set aside numerous jury overrides. The rule is now clear that under Tedder, a jury recommendation of life imprisonment must be upheld if any reasonable basis can be identified to support the jury's recommendation of life. See Keen, 775 So.2d at 283. No one disputes that a reasonable basis exists for the jury's recommendation of life for Mills.
An examination of Keen vividly illustrates our mistake in failing to enforce the Tedder rule in Mills. Keen actually involved circumstances much more egregious than those involved herein, since Keen involved a killing planned by the defendant well in advance of its execution. However, the jury recommended life for Keen, and this Court reversed a judge's override sentencing Keen to death, declaring that the more lenient sentence imposed on an accomplice, in and of itself, provided a reasonable basis for the jury's action. As explained in Keen, the process of weighing aggravating and mitigating factors as was erroneously done in Mills' case, and by the trial judge in Keen, simply does not apply in cases where the jury recommends life. See id. We further explained:
Moreover, so there is no doubt as to the proper focus of a life recommendation analysis, reversal under Tedder is in no way prevented even assuming the presence of several valid aggravators. Indeed, that has been the rule rather than the exception. See Johnson v. Dugger, 911 F.2d 440, 474 n. 78 (11th Cir.1990) (listing 47 cases reversed by this Court under Tedder between 1975 and 1989 where between one to five valid aggravating factors existed or were assumed to exist), vacated on other grounds, 920 F.2d 721 (11th Cir.1990); Fuente, 549 So.2d at 658-59 (recognizing propriety of jury override reversal in Brookings v. State, 495 So.2d 135, 143 (Fla.1986) despite presence of four "valid" aggravators).
Keen, 775 So.2d at 287 n. 24. Clearly, the disparate treatment of a codefendant, whether alone or in combination with other mitigation, constitutes a reasonable basis to support a jury's recommendation of life imprisonment. See id. at 284 n. 19. Indeed, this Court itself has relied upon the disparate treatment of a codefendant as a critical factor in its proportionality review of dozens of death sentences. See, e.g., Scott v. Dugger, 604 So.2d 465 (Fla.1992); Slater v. State, 316 So.2d 539, 542 (Fla. 1975).
*543 It is also important to note that the injustice of the treatment of Mills has not gone unnoticed by members of this Court. Indeed, numerous justices have called to the Court's attention that the disparate treatment of Mills' codefendant, by itself and in conjunction with other mitigation, clearly constituted a reasonable basis for the jury's recommendation of life for Mills under Tedder, as applied in Cochran and subsequent cases. For example, Justice McDonald in Mills' direct appeal, joined by Justice Overton, strongly dissented from the majority's decision to affirm the trial court's override in an opinion that mirrors our later opinion in Keen:
I dissent only from the affirmance of the death sentence. Were it not for the jury's recommendation, I would have little difficulty in upholding the death sentence. Valid aggravating circumstances existed, and the defense established the existence of no statutory mitigating circumstances.
The jury, however, recommended life imprisonment. In such instances we have stated that "the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Tedder v. State, 322 So.2d 908, 910 (Fla.1975). We should, therefore, review Mills' sentence in light of Tedder.

The jury's recommendation must have been predicated on the circumstances of this homicide and on nonstatutory mitigating evidence. The chief testimony against Mills came from Ashley [the codefendant]. As previously indicated, Ashley received immunity from prosecution for this crime and other crimes in exchange for his testimony. Ashley said that Mills did the killing, but Mills has always denied this. The jury could have found the evidence sufficient to convict but still have had doubts about whether Mills intended to kill the victim. It could also have concluded that Mills and Ashley were being treated so disparately when their involvement was substantially the same that any such doubt should be weighed in Mills' favor. Mills was employed at the time of the crime and his employer thought well of him. Mills had a harsh and deprived youth, but his grandmother and sister were supportive of him. During prior incarceration he completed studies to the extent that he passed his G.E.D. tests.
Are these circumstances, considered collectively, adequate to find that reasonable persons could recommend life imprisonment? I think so. As previously indicated, adequate and reasonable grounds existed for the trial judge to impose death. For the death penalty to prevail when there is a jury recommendation of life, however, more than a disagreement with a jury's recommendation must be shown. "[T]he facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Id. This is a difficult test, and it has not been met in this case.
Mills, 476 So.2d at 180 (McDonald, J., concurring in part/dissenting in part). Of course, this is precisely how this Court explained the rule of Tedder in Cochran and Keen.
Later, in Mills' appeal from the denial of his motion for postconviction relief, three members of this Court again expressed concern with the jury override issue. In a dissenting opinion in which Justices Shaw and Kogan concurred, Justice Barkett pointed out that Mills was entitled to the imposition of a life sentence because he had demonstrated an additional basis for a jury's recommendation of mercy, even beyond the disparate treatment of the codefendant *544 and the nonstatutory mitigation previously presented:
At the evidentiary hearing below, the two mental health experts who examined Mills prior to the hearing testified extensively about Mills's mental impairments. They concluded that Mills suffered from a substantially impaired capacity to conform his conduct to the requirements of law and from an extreme mental or emotional disturbance at the time of the offense. They also explained that Mills's level of functioning was below that of his chronological age and that Mills's brain damage, low intelligence, psychological deficiencies, and history of traumatic abuse and deprivation had further diminished his ability to function throughout his life, as well as at the time of the offense. I cannot say beyond a reasonable doubt that this Court would not have reversed the jury override under Tedder v. State, 322 So.2d 908, 910 (Fla.1975), had such mental mitigating evidence been presented during the penalty phase hearing.
Mills, 603 So.2d at 486-87 (Barkett, J., dissenting). Hence, no less than five justices of this Court have called attention to the injustice of the override of the jury's finding for life in Mills' case.
When a life is at stake this Court should not hesitate to admit its past mistakes. We did so in Cochran on this precise issue. We should do so here. In the words of Justice Kogan:
To fail in this regard would render our capital punishment system utterly arbitrary. The majority relies on the formalities of procedure to justify the imposition of the death penalty in this case, despite the inappropriateness of such imposition.
Since the time Spaziano was sentenced to death, and this Court affirmed that sentence, our cases have more fully refined the standards under which the death penalty may be imposed over a recommendation of life. These cases clearly enunciate that in the presence of any reasonable basis for such a recommendation, that recommendation must be upheld. While aggravation and mitigation are not irrelevant, there is no weighing process involved here. Even when the judge determines that the aggravating circumstances outweigh the mitigating circumstances, we are obligated to view a jury recommendation of life with the highest regard. Under our present law, a life recommendation can only be overridden in cases where there is absolutely no basis for the recommendation, when the recommendation appears based on emotion, caprice, or some other irrelevant factor. Otherwise, the life recommendation must be upheld.
If we are to administer a death penalty that is not arbitrary, then we must do so in a consistent fashion. The standards by which the majority justified the jury override are no longer acceptable. We are empowered to correct a sentence according to our evolving standards, as we did in Proffitt v. State, 510 So.2d 896 (Fla.1987).
Spaziano v. State, 545 So.2d 843, 846 (Fla. 1989) (Kogan, J., dissenting). Because the standard this Court previously applied in permitting the judge's override of the jury's decision was admittedly erroneous, as we acknowledged in Cochran, we must correct Mills' sentence so as to avoid the unjust and arbitrary taking of a life here.
Over the years, the major concern expressed by courts, including the United States Supreme Court, as to the constitutionality of the application of the death penalty, has been the fear that the penalty may be applied arbitrarily. The arbitrary *545 execution of Mills, whose case cannot be distinguished in any meaningful way from that of Cochran, Keen and countless other cases where we have mandated adherence to Tedder, is that fear come true.
We have recognized, time and time again, that the other branches of government, and especially the executive branch which has the responsibility to carry out the death penalty, relies on the judicial branch, and especially this Court, to get it right before a life is taken. We did not get it right here, and we should not hesitate to say so before Mills is put to death because of our mistake. Otherwise our message is clear: death is not so different after all.
SHAW and PARIENTE, JJ., concur.
PARIENTE, J., dissenting.
I join in Justice Anstead's dissent.[8] The undeniable fact is that a proper and consistent application of Tedder v. State, 322 So.2d 908 (Fla.1975), would result in this Court honoring the jury's recommendation of life and therefore requires that we revisit our prior ruling in this case. The issue in this case is whether the doctrine of the law of the case precludes our revisiting the jury override issue. I conclude that it does not because it would be a manifest injustice for Mills to be executed when, under identical circumstances, he would not be executed if this Court had reviewed his sentence at any time after 1985. Contrary to Justice Harding's assertion in his concurrence, a proper and consistent application of Tedder does not result in our making "new law on a case-by-case basis in order to reach a desired result." Concurring op. at 540. Rather, a proper and consistent application of our long-standing Tedder analysis mandates that we reduce Mills' sentence to life in order to fulfill "our responsibility to apply the law uniformly in all cases, regardless of the status of the players or the stakes of the game." Id. It is precisely because this Court has openly acknowledged in Cochran v. State, 547 So.2d 928, 933 (Fla.1989), that it did not properly and "uniformly" apply Tedder to Mills and other defendants, that we are urged to correct our mistake now before a life is taken based on that mistake.
As this Court has explained the doctrine of the law of the case:
Generally, under the doctrine of law of the case, "all questions of law which have been decided by the highest appellate court become the law of the case which must be followed in subsequent proceedings, both in the lower and appellate courts." However, the doctrine is not an absolute mandate, but rather a self-imposed restraint that courts abide by to promote finality and efficiency in the judicial process and prevent relitigation of the same issue in a case. This Court has the power to reconsider and correct erroneous rulings in exceptional circumstances and where reliance on the previous decision would result in manifest injustice, notwithstanding that such rulings have become law of the case.

State v. Owen, 696 So.2d 715, 720 (Fla. 1997) (emphasis added).
In Porter v. State, 723 So.2d 191, 197-98 (Fla.1998), this Court reconsidered a trial court's override of a jury's recommendation *546 of a life sentence in a death case where the issue before the Court was whether the trial court was impartial. The Court explained that the constitutional infirmity concerning due process based upon the trial court's lack of impartiality overcame the procedural bar of the law of the case. See id. at 198.
Moreover, in Owen, we rejected the invocation of the law of the case doctrine by the defendant and we invoked a change in the law in favor of the State. 696 So.2d at 720. In Owen, this Court initially reversed a defendant's first-degree murder conviction because we concluded that the defendant had given an equivocal invocation of the right to terminate questioning, in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Owen, 696 So.2d at 717. After this decision, but before the defendant's retrial, the United States Supreme Court issued its decision in Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), in which it held that neither Miranda nor its progeny required police officers to stop questioning when the defendant makes an equivocal or ambiguous request for counsel. See Owen, 696 So.2d at 717. Prior to retrial, the State moved the trial court to reconsider the admissibility of the defendant's confession in light of Davis, but the trial court held the confession inadmissible. See id. The district court affirmed, holding that the suppression constituted the law of the case, but certified the issue to this Court. See id. This Court rejected the application of law of the case under these circumstances, holding that
the Supreme Court's decision in Davis qualifies as an exceptional situation ... [and] we find that reliance upon our prior decision in Owen's direct appeal would result in manifest injustice to the people of this state because it would perpetuate a rule which we have now determined to be an undue restriction of legitimate law enforcement activity.
Id. at 720.
The exception to law of the case applies equally to intervening legislative actions. For example, in Trotter v. State, 690 So.2d 1234, 1237 (Fla.1996), this Court held that "[a]n intervening act of the legislature refining a portion of Florida's death penalty statute may be sufficiently exceptional to warrant modification of the law of the case." In Trotter, this Court initially reversed the trial court's finding as an aggravating factor the fact that the defendant was on community control at the time he committed the murder. Id. at 1236. At resentencing, the trial court again found that community control constituted an aggravating circumstance. See id. This Court rejected the defendant's argument that the application of community control as an aggravating factor violated the doctrine of law of the case, explaining:
In light of the specificity and promptness of the 1991 amendment to section 921.141(5)(a), and in view of our prior caselaw giving retroactive application to other aggravating circumstances effecting a refinement in the law, reliance on Trotter would result in manifest injustice to the people of Florida by perpetuating an anomalous and incorrect application of the capital sentencing statute.

Id. at 1237 (emphasis supplied).
Given this Court's prior application of the exception to the law of the case doctrine, I would conclude that the failure to reconsider the jury override issue in this case constitutes a manifest injustice. As Justice Anstead correctly notes in his dissenting opinion, even though a faithful application of Tedder clearly required that Mills' sentence be reduced to life at the time of the direct appeal, until 1985 this *547 Court's application of Tedder often led to patently inconsistent outcomes. See dissenting op. at 541-42. In Cochran, 547 So.2d at 933, this Court candidly acknowledged its prior inconsistent application of Tedder. Therefore, to apply the doctrine of law of the case to preclude consideration of this inconsistent application of Tedder rises to the level of manifest injustice, justifying a reconsideration of the jury override issue.[9] To fail to do so would result in an "anomalous and incorrect application of the capital sentencing statute." Trotter, 690 So.2d at 1237.
Moreover, application of this exception to the law of the case doctrine is consistent with our responsibility to ensure that sentences of death are not arbitrarily and inconsistently imposed. Whether Mills will live or die depends on this Court's willingness to acknowledge that a proper and uniform application of our case law requires that this defendant's sentence of death be reduced to life in accordance with his jury's recommendation.
SHAW and ANSTEAD, JJ., concur.
NOTES
[1] On appeal of the denial of his federal habeas corpus petition, Mills argued, as he does in the second issue of this instant proceeding, that the trial court's jury override resulted in an arbitrary and discriminatory sentence and would not have been sustained on direct appeal today. The Eleventh Circuit disagreed and held that we "complied with the mandate of Tedder" in the direct appeal, and that Mills' claim was a disguised request for another proportionality review. Id. at 1238.
[2] Apprendi involved a New Jersey statute that authorized an enhanced penalty for a crime proven to be a "hate crime" if the judge found by a preponderance of the evidence that the crime was motivated by a purpose to intimidate an individual or group because of race, color, gender, handicap, religion, sexual orientation or ethnicity. The defendant in Apprendi was not charged with a "hate crime" in the indictment. He pled guilty on three counts, and the judge enhanced the penalty on one of the counts beyond the statutory maximum, in accord with the "hate crime" enhancement statute, after he held a hearing to determine the "purpose" of the crime.
[3] Florida's sentencing scheme was originally upheld in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), which observed that the jury's recommendation is advisory only and that the sentence is to be determined by the judge, and held that jury sentencing is not constitutionally required.
[4] Section 921.141, Florida Statutes (1979), provides:

Upon conviction or adjudication of guilt of a defendant of a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment as authorized by s. 775.082.
. . . .
(3) ... Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death....
[5] The only additional evidence presented at the presentencing hearing was the presentence investigation report and certified copies of various criminal convictions. Mills argued that he had no significant criminal history in support of mitigation. The trial judge specifically indicated that the evidence of criminal convictions and the information contained in the presentence investigation report was only considered for purposes of mitigation (i.e. to rebut Mills' claim of no significant criminal history) and not as an aggravating factor. Indeed, the two additional aggravating factors the trial court found were unrelated to the evidence received at the presentencing hearing.
[6] In Proffitt, the defendant, while burglarizing a home, stabbed and killed the victim as he lay sleeping in bed. He was subsequently convicted and sentenced to death in 1974. Proffitt's conviction and sentence were affirmed by this Court on direct appeal. See Proffitt v. State, 315 So.2d 461 (Fla.1975). The United States Supreme Court granted review but upheld Florida's death penalty statute against an Eighth Amendment challenge. See Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). However, some thirteen years later we set aside Proffitt's death sentence because our own proportionality standards had changed and declared:

We recognize that Proffitt is a case of considerable notoriety because it resulted in the United Supreme Court's upholding the facial validity of Florida's death penalty statute. The death sentence law as it now exists, however, controls our review of this resentencing. There have been multiple restrictions and refinements in the death sentencing process, by both the United States Supreme Court and this Court, since this matter was first tried in 1974 and affirmed in 1975, and we are bound to fairly apply those decisions.
Proffitt, 510 So.2d at 897. Ironically, Mills was convicted of felony murder also based upon the commission of a burglary, and arguably under less egregious circumstances than those involved in Proffitt.
[7] In Keen v. State, we declared:

As we unambiguously stated several years ago:
Under Florida law, the role of the jury is one of great importance, and this is no less true in the penalty phase of a capital trial. Tedder. Juries are at the very core of our Anglo-American system of justice, which brings the citizens themselves into the decision-making process. We choose juries to serve as democratic representatives of the community, expressing the community's will regarding the penalty to be imposed.
775 So.2d at 285 n. 21 (quoting Stevens v. State, 613 So.2d 402, 403 (Fla.1992)).
[8] I agree with the majority, however, that the United States Supreme Court majority opinion in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 2366, 147 L.Ed.2d 435 (2000), by its express terms did not apply to capital sentencing and thus does not provide a basis for granting Mills relief. Nonetheless, I point out that a jury recommendation of life might, under a logical extension of the reasoning in Apprendi, preclude a trial court from overriding a jury's life recommendation.
[9] I therefore would recede from this Court's contrary holdings in Porter v. Dugger, 559 So.2d 201, 203 (Fla.1990), and Johnson v. Dugger, 523 So.2d 161, 162 (Fla.1988).