911 So.2d 1129 (2005)
Matthew MARSHALL, Petitioner,
v.
James V. CROSBY, Jr., etc., Respondent.
No. SC02-420.
Supreme Court of Florida.
May 26, 2005.
Rehearing Denied September 15, 2005.
*1130 Neal A. Dupree, Capital Collateral Regional Counsel  South, Melissa Minsk Donoho, Special Assistant CCRC-South, and Leor Veleanu, Assistant CCRC-South, Fort Lauderdale, FL, for Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Debra Rescigno, Assistant Attorney General, West Palm Beach, FL, for Respondent.
PER CURIAM.
Matthew Marshall, a prisoner under sentence of death, petitions this Court for a writ of habeas corpus. We have jurisdiction. See Art. V, § 3(b)(9), Fla. Const. For the reasons set forth below, we deny Marshall's petition for habeas relief.

BACKGROUND
Matthew Marshall was convicted and sentenced to death for the 1988 murder of Jeffrey Henry. This Court previously summarized the facts surrounding this case on direct appeal. See Marshall v. State, 604 So.2d 799 (Fla.1992). The jury found Marshall guilty of first-degree murder and recommended a sentence of life imprisonment. The trial court, however, rejected the jury's recommendation and imposed a sentence of death. In so doing, the trial court "concluded that facts supporting a conclusion that the mitigating circumstances did not outweigh the aggravating circumstances were `so clear and convincing that no reasonable person could differ.'" Id. at 802.[1] This Court affirmed *1131 the jury override on appeal. See id. at 805-06. The United States Supreme Court denied Marshall's petition for writ of certiorari on May 17, 1993. See Marshall v. Florida, 508 U.S. 915, 113 S.Ct. 2355, 124 L.Ed.2d 263 (1993). Subsequently, Marshall filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, which the trial court denied. See Marshall v. State, 854 So.2d 1235, 1237 (Fla.2003). On appeal, this Court affirmed the denial of the motion, but remanded Marshall's claim on potential juror misconduct for an evidentiary hearing. Id. at 1253.

ANALYSIS
In his present habeas corpus petition, Marshall raises three claims: (1) appellate counsel was ineffective for failing to raise on direct appeal the trial court's denial of trial counsel's motion for the appointment of an additional mental health expert, (2) the trial judge's override of the jury's recommendation in favor of life violates the Constitution pursuant to the United States Supreme Court's opinions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and (3) the standard for jury override cases announced in Tedder v. State, 322 So.2d 908 (Fla.1975), was arbitrarily applied in Marshall's case. We address each of these claims in turn.

Additional Mental Health Expert
In his first claim, Marshall argues that appellate counsel was ineffective for failing to raise as error on direct appeal the trial court's denial of his motion for appointment of an additional mental health expert.[2] Marshall alleges that as a result of the trial court's ruling, he was deprived of his right to a competent mental health expert pursuant to Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Ake requires that a defendant be afforded access to a "competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Id. at 83, 105 S.Ct. 1087.
The issue of appellate counsel's ineffectiveness is appropriately raised in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). However, in order to grant habeas relief on the basis of ineffectiveness of appellate counsel, this Court must determine
whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result. *1132 Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at 1069. "The defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So.2d at 1069.
Prior to trial, defense counsel requested that a mental health expert be appointed to examine Marshall for competency and sanity, as well as for the existence of possible mitigating circumstances. Defense counsel specifically requested that Dr. Joel Klass, with whom the public defender's office had previously worked, be appointed. The trial court granted the motion and appointed Dr. Klass to examine Marshall. Subsequent to Dr. Klass' s examination, however, defense counsel filed a motion for an additional mental health expert, expressing counsel's dissatisfaction with both Dr. Klass's examination of Marshall and his correspondence with defense counsel. Accordingly, in the motion defense counsel requested that an additional mental health expert be appointed to evaluate Marshall.
The trial court held a hearing on Marshall's motion, during which defense counsel reiterated claims from the motion for an additional mental health expert, including a claim that Dr. Klass apparently spent no more than one hour with Marshall, and that aside from two short letters, he had failed to communicate with defense counsel or inform counsel of what tests, if any, were administered and what evidence might be gathered in mitigation. The State opposed Marshall's motion, arguing that (1) it would be a waste of the trial court's time and the county's money to appoint an additional expert, since Dr. Klass had completed an evaluation and simply needed to communicate with defense counsel in accordance with the trial court's order, and (2) the additional expert specifically requested, a Dr. Robert Berland, was not qualified to perform the desired work. The State suggested that the trial court order Dr. Klass to comply with its previous order appointing him. Thereafter, the trial court orally denied Marshall's motion for an additional mental health expert. In so doing, the trial court noted that based upon its prior experience with Dr. Klass, it did not believe he was incompetent, nor had defense counsel shown Dr. Klass was incompetent. However, the trial court indicated that it would order Dr. Klass to comply with its previous order and to conduct another interview of Marshall if necessary. The trial court subsequently entered a written order denying Marshall's motion and requiring Dr. Klass to comply with its previous order and submit a written report to defense counsel in addition to communicating with defense counsel by telephone.
As noted above, Marshall contends appellate counsel was ineffective for failing to challenge the trial court's denial of his motion for an additional mental health expert on direct appeal. In our most recent opinion concerning Marshall, we indicated that trial counsel was not ineffective for failing to get the trial court to appoint an additional expert and that the issue regarding the appointment of an additional expert was "adequately documented in the record and could have been raised on appeal." Marshall, 854 So.2d at 1248. To be effective, however, appellate counsel is not required to raise every conceivable issue on appeal. See Atkins v. Dugger, 541 So.2d 1165, 1167 (Fla.1989). Moreover, appellate counsel cannot be ineffective for not raising on appeal an issue with little or no merit. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000) ("If a legal issue `would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the *1133 failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective.").
A trial court's ruling on a motion for appointment of experts will be affirmed on appeal in the absence of an abuse of discretion. See San Martin v. State, 705 So.2d 1337, 1347 (Fla.1997); Sliney v. State, 699 So.2d 662, 671 (Fla.1997); Martin v. State, 455 So.2d 370, 371-72 (Fla.1984). In San Martin, this Court explained the applicable standard when a defendant alleges error in the trial court's decision to not appoint an expert:
In evaluating whether there was an abuse of discretion, courts have applied a two-part test: (1) whether the defendant made a particularized showing of need; and (2) whether the defendant was prejudiced by the court's denial of the motion requesting the expert assistance.
San Martin, 705 So.2d at 1347 (citing Dingle v. State, 654 So.2d 164, 166 (Fla. 3d DCA 1995)).
In the instant case, the trial court's order denying Marshall's request for an additional mental health expert specifically ordered Dr. Klass to comply with the court's previous order, submit a written report to defense counsel on the issues specified in that order, and communicate with defense counsel for the purposes of pretrial preparation. Although the trial court declined to appoint an additional mental health expert, it sought to remedy the specific difficulties defense counsel was reportedly experiencing with Dr. Klass by ordering Dr. Klass to comply with the court's initial order of appointment, as well as communicate with defense counsel. Notably, defense counsel made no subsequent representations to the trial court that he continued to experience difficulties with Dr. Klass or that Dr. Klass had failed to comply with the trial court's order. Nor did trial counsel contest the trial court's refusal to appoint an additional mental health expert in Marshall's motion for a new trial. Under these circumstances and in light of the trial court's order directing Dr. Klass to comply with its initial order of appointment, we conclude that Marshall has failed to demonstrate that the trial court abused its discretion in denying his motion for appointment of an additional mental health expert.[3] Accordingly, appellate counsel was not ineffective for failing to raise this claim on direct appeal.

Apprendi and Ring Claim
Marshall's next claim is that the trial judge's decision to override the jury's recommendation in favor of life violates the *1134 principles set out in the Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).[4] In over fifty cases since Ring's release, we have rejected Ring claims.[5]
Although we have not addressed Ring's application in the context of a jury override verdict, our previous conclusions with regard to Ring claims preclude Marshall from being granted relief on his claim. First, as our plurality opinion noted in Bottoson, "the United States Supreme Court repeatedly has reviewed and upheld Florida's capital sentencing statute over the past quarter of a century." Bottoson, 833 So.2d at 695 & n. 4 (Fla.2002) *1135 (listing as examples Hildwin v. Florida, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989), Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), and Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)). In fact, the United States Supreme Court expressly upheld the jury override aspect of Florida's sentencing scheme. See Spaziano, 468 U.S. at 466, 104 S.Ct. 3154 ("We see nothing that suggests that the application of the jury-override procedure has resulted in arbitrary or discriminatory application of the death penalty, either in general or in this particular case."). Spaziano remains good law, and as was noted in the Bottoson plurality opinion, despite any tension between Spaziano and Ring, this Court relies on the United States Supreme Court's admonition that lower courts should "follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Bottoson, 833 So.2d at 695 (quoting Rodriguez de Quijas v. Shearson/American Express, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).
Second, Ring did not alter the express exemption in Apprendi that prior convictions are exempt from the Sixth Amendment requirements announced in the two cases. See Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). We have repeatedly relied on the presence of the prior violent felony aggravating circumstance when denying Ring claims.[6] In the instant case, one of Marshall's aggravating circumstances was that he had been previously convicted of nine violent felonies. Therefore, even if Ring were to call Florida's jury override procedures into question, Marshall's nine prior violent felonies are an aggravating circumstance that takes his sentence outside the scope of Ring's requirements.
Finally, we have recently held in Johnson v. State, 904 So.2d 400 (Fla. 2005) that we will not apply Ring retroactively in postconviction cases even assuming it affected Florida law.

Application of Tedder Standard
In the final claim of his habeas petition, Marshall alleges that Tedder v. State, 322 So.2d 908 (Fla.1975), which allows the trial judge to override a jury recommendation in capital cases, was arbitrarily applied in this case based on language found in Keen v. State, 775 So.2d 263 (Fla.2000). In Tedder, this Court held *1136 that "[i]n order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Tedder, 322 So.2d at 910. More recently, this Court in Keen reiterated the proper analysis for a Tedder inquiry: "The singular focus of a Tedder inquiry is whether there is `a reasonable basis in the record to support the jury's recommendation of life,' rather than the weighing process which a judge conducts after a death recommendation." Keen, 775 So.2d at 283-84 (citation omitted). The Court further explained that "the jury's life recommendation changes the analytical dynamic and magnifies the ultimate effect of mitigation on the defendant's sentence." Id. at 285.
In Mills v. Moore, 786 So.2d 532 (Fla. 2001), this Court rejected an argument similar to the one currently raised by Marshall. In so doing, this Court stated:
While conceding that Keen is not new law, Mills nonetheless argues that Keen's application of Tedder constitutes a new standard by which jury override cases are reviewed. Keen is not a major constitutional change or jurisprudential upheaval of the law as it was espoused in Tedder. Keen offers no new or different standard for considering jury overrides on appeal. Thus, we disagree with Mills' contention that Keen offers a new standard of law and we reject the contention that Keen was anything more than an application of our long-standing Tedder analysis.

Tedder is the seminal case in Florida on jury overrides and remains so after Keen. Tedder was applied to this case. Keen provides no basis for our reconsideration of this issue.
Id. at 539-40.
In the instant case, we reviewed the propriety of the trial court's override on direct appeal under the standard set forth in Tedder. In particular, this Court explained:
Marshall next alleges that the trial court abused its discretion in sentencing Marshall to death where the jury had made a recommendation of life imprisonment. It is well settled in Florida that a judge imposing sentence in a capital case must accord the jury recommendation great weight. E.g., Tedder v. State, 322 So.2d 908, 910 (Fla.1975). Where a jury has recommended a life sentence, the court must follow that recommendation unless "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ." Id. Where the record contains no evidence supporting a life recommendation, the trial court does not err in declining to follow that recommendation.
In this case, the record contains insufficient evidence to reasonably support the jury's recommendation of life. Marshall's father was unable to attend the trial, but the defense and prosecution stipulated that he would have testified that Marshall did well in school until his early teens when his older brother influenced him to run the streets and break the law; that Marshall's mother did not discipline Marshall and allowed him to believe there would be no consequences for his behavior; and that Marshall's father loved him and requested a life sentence for his son. The trial court determined these facts were not mitigating, but did find Marshall's behavior at trial as well as his entering prison at a young age to be mitigating. We find no error in the court's assessment of this mitigation and conclude that it does not provide a reasonable basis for the jury's recommendation of life in this case. Even viewing this mitigation in the light *1137 most favorable to Marshall, it pales in significance when weighed against the four statutory aggravating circumstances, including Marshall's record of violent felonies consisting of kidnapping, sexual battery, and seven armed robberies.
Furthermore, defense counsel's argument composed largely of a negative characterization of the victim does not provide a reasonable basis for the jury's life recommendation. Moreover, contrary to Marshall's assertion, the facts surrounding the murder do not suggest that the murder was committed in self defense or in a fit of rage. The witnesses heard muffled screams and moans emanating from the victim's cell and observed Marshall leaving the cell with what appeared to be blood on his chest and arms. Within a few minutes, Marshall reentered the cell and similar noises were again heard. The victim was found lying face down with his hands bound behind his back and his ankles were restrained. The victim received no less than twenty-five separate wounds and blood was sprayed and splattered about the cell. Death was caused by blows to the back of his head. Nothing in these facts supports the notion that Marshall acted in self defense or that he simply killed the victim in the heat of a fight. We thus conclude that the trial court did not abuse its discretion in finding the facts supporting the death sentence to be "so clear and convincing that no reasonable person could differ." See Tedder, 322 So.2d at 910.
Marshall, 604 So.2d at 805-06. Accordingly, as in Mills, this claim provides no basis for relief.

CONCLUSION
For the reasons set forth above, we deny Marshall's petition for writ of habeas corpus.
It is so ordered.
WELLS, QUINCE, CANTERO, and BELL, JJ., concur.
CANTERO, J., concurs with an opinion, in which WELLS and BELL, JJ., concur.
LEWIS, J., concurs in result only with an opinion.
PARIENTE, C.J., dissents with an opinion.
ANSTEAD, J., dissents with an opinion.
CANTERO, J., concurring.
I concur in the majority opinion. I write only to respond to Chief Justice Pariente's dissent, which addresses Marshall's jury override claim. We considered and denied that claim in Marshall's direct appeal. See Marshall v. State, 604 So.2d 799, 805-06 (Fla.1992). Therefore, the claim is procedurally barred. See, e.g., Parker v. Dugger, 550 So.2d 459, 460 (Fla. 1989) (holding that habeas is improper to relitigate issues that either were or could have been raised on direct appeal). We need say no more.
Justice Pariente would nevertheless disregard the procedural bar in these circumstances. I know of no case among the nearly 30-year-old jurisprudence of this Court considering collateral relief in death penalty cases, and the hundreds of such cases we have decided during that period, allowing an exception to the proposition that issues raised on direct appeal from a sentence of death will not be considered on review from denial of postconviction relief. To do so now would require us to recede from a legal proposition so ingrained in our death penalty jurisprudence that it has become black-letter law. Even if we limited the exception to jury overrides, tomorrow we would be inundated with requests *1138 to create exceptions in a myriad of other circumstances. I would not open that door.
WELLS and BELL, JJ., concur.
LEWIS, J., concurring in result only.
I reiterate my concern that a trial judge's override of a jury's life recommendation stands in apparent "irreconcilable conflict" with the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002):
If Apprendi[7] and Ring support the proposition that it is unconstitutional for a trial judge to independently find fact with regard to aggravators and impose a sentence of death without jury involvement, surely the Supreme Court's Spaziano[8] decision authorizing a trial judge's complete disregard for a sentencing jury's recommendation based upon jury findings of aggravating factors cannot now stand. I cannot avoid the conclusion that if Ring mandates penalty phase jury findings for the imposition of capital sentences, a trial judge may not simply dismiss the jury's recommendation based upon these findings and do precisely what Ring prohibits. A trial court simply cannot sentence a defendant to death through findings of fact rendered completely without, and in the case of a jury override, directly contrary to, a jury's advice and input. As has been noted by this Court in the past, a "jury's life recommendation changes the analytical dynamic," and under Ring, this life recommendation must be respected. Thus, this is not only an asserted irreconcilable conflict, in my view it is a conflict we should acknowledge.
Bottoson v. Moore, 833 So.2d 693, 727-28 (Fla.2002) (Lewis, J., concurring in result only) (citation omitted). Nevertheless, in the present case, I agree that Ring is inapplicable, as explained below.
The United States Supreme Court in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), was confronted with the issue of whether a judge, sitting without a jury, could conduct the fact-finding necessary to enhance a defendant's sentence by two years under a "hate-crimes" statute. In conducting its analysis, the Supreme Court first acknowledged the importance of the interests that were at stake, see id. at 476, 120 S.Ct. 2348 ("At stake in this case are constitutional protections of surpassing importance."), and the Court then announced a bright-line rule of law that would protect those interests appropriately: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348.
Two years later, the United States Supreme Court in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), applied Apprendi's bright-line rule to capital cases, holding as follows: "Because... aggravating factors operate as `the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." Ring, 536 U.S. at 609, 122 S.Ct. 2428 (citation omitted). The Court explained further:
The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's *1139 sentence by two years, but not the factfinding necessary to put him to death.
Id. Based on language in both Apprendi and Ring, the holding of Ring appeared to implicate constitutional interests of the highest order and seemed to go to the very heart of the Sixth Amendment. And yet, two years after Ring was decided, the Supreme Court appears to have somewhat altered the foundation.
When asked to decide the retroactivity of Ring, the United States Supreme Court in Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), first explained that "[t]his holding [in Ring ] did not alter the range of conduct Arizona law subjected to the death penalty" and that Ring therefore was procedural rather than substantive. Summerlin, 124 S.Ct. at 2523. And second, the Court relied upon its own prior decision in DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) (declining to give retroactive application to a 1968 decision that extended the jury-trial guarantee to the states), and concluded that Ring did not establish a "watershed rule of criminal procedure":
If under DeStefano a trial held entirely without a jury was not impermissibly inaccurate, it is hard to see how a trial in which a judge finds only aggravating factors could be.
Summerlin, 124 S.Ct. at 2526. The Court then held: "Ring announced a new procedural rule that does not apply retroactively to cases already final on direct review." Summerlin, 124 S.Ct. at 2526.
Based on Summerlin  as surprising as that decision may be[9] in light of the Supreme Court's own prior language in Apprendi and Ring  I can only conclude that Ring cannot be applied retroactively in Florida even upon application of our Witt[10] analysis. The United States Supreme Court is the ultimate arbiter of the federal constitution, and the decision in Ring is that Court's own Sixth Amendment interpretation and application. If the United States Supreme Court has held and stated that Ring is not a "watershed rule of criminal procedure" but merely a "new procedural rule that does not apply retroactively," then I am precluded from determining that Ring is of fundamental significance, significant magnitude or constitutes a "jurisprudential upheaval" under Florida law, even though if writing upon a clean slate I would certainly do so. Further, the purpose served by a new rule of law is a key factor in determining retroactivity in Florida,[11] and the United States Supreme Court in DeStefano held that the purpose served by the jury-trial guarantee ("to prevent arbitrariness and repression") "favor[s] only prospective application" of that guarantee to the states.[12] Therefore, I cannot logically say that the purpose served by the jury fact-finding requirement *1140 of Ring favors a different treatment in this regard.
Based on the foregoing, I must agree that Ring is inapplicable in this post-conviction case.
PARIENTE, C.J., dissenting.
I agree that Marshall is not entitled to relief under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We have held that Ring does not apply retroactively to death sentences that have been affirmed on direct appeal and are thus considered final. See Johnson v. State, 904 So.2d 400 (Fla. 2005). Consequently, any other basis for denying Ring relief is superfluous.
However, I dissent from the denial of habeas relief because I conclude that when this Court upheld the trial court's override of the jury's recommendation of life imprisonment in Marshall's direct appeal, we failed to follow our own precedent in Tedder v. State, 322 So.2d 908 (Fla.1975). As Tedder mandates, the jury's recommendation carries great weight and should be followed unless "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ." Id. at 910. The test is whether there is a reasonable basis in the record upon which the jury could have recommended life. See Keen v. State, 775 So.2d 263, 283 (Fla.2000).
As explained by Chief Justice Barkett in the direct appeal as to why the jury's recommendation of life imprisonment should be honored,
in this case reasonable people could differ as to the appropriateness of the death penalty, and the court's override was therefore improper.
In addition to considering the stipulated testimony of Marshall's father, the jury could have reasonably viewed the evidence of the murder in a light more favorable to Marshall. In his closing argument to the jury, defense counsel conceded that the aggravating circumstances of murder committed while under a sentence of imprisonment and previous conviction of a violent felony were established, but strongly argued against the existence of the other aggravators presented by the State. He argued that the death penalty should be reserved only for the worst murderers and worst aggravation. He pointed out that the evidence showed that Marshall and Henry had no prior problems with each other and had socialized together at the prison. Defense counsel emphasized that the circumstances of the crime indicate no prior plot or plan to kill since Marshall entered the cell unarmed and the murder was committed with a battery pack belonging to and found within the cell of the victim. He argued that offensive wounds on Henry's hands showed that the murder occurred during the course of a fight and that Henry was a violent person. He also noted that Henry's skull was not fractured and his facial bones weren't broken, indicating that Marshall did not intend to torture the victim or inflict additional injuries once he was rendered unconscious. Defense counsel also pointed out that the murder was not committed for financial gain. Finally, defense counsel argued that Marshall's age and background mitigate the offense as well. He pointed out that a life sentence of 25 years on top of the sentence of 46 years that Marshall was already serving would keep Marshall in prison for a substantial period of time.
I believe this view of the evidence provided a reasonable basis upon which the jury could recommend a life sentence. While the jury may not have believed that Marshall acted in self defense *1141 to excuse the killing, it could have reasonably inferred from the evidence that a fight erupted between Marshall and Henry and that Marshall killed Henry in a fit of rage. It is also likely that the jury rejected some of the aggravators found by the judge or assigned them minimal weight. Additionally, the jury could have reasonably found mitigation in Marshall's family background, and determined, based on the nature of the crime and the circumstances surrounding it, that the death penalty was not the appropriate penalty in this case.... Although some may not view the mitigation as compelling in this case, I cannot say that no reasonable person could have recommended a life sentence for Matthew Marshall.
Marshall v. State, 604 So.2d 799, 806-07 (Fla.1992) (Barkett, C.J., concurring in part and dissenting in part) (citations omitted).
Although the Court's rejection of Marshall's claim that the override could not be sustained under Tedder is law of the case that we normally would not revisit, the law of the case doctrine is not immutable. As I previously stated in another override case,
[t]he doctrine is not an absolute mandate, but rather a self-imposed restraint that courts abide by to promote finality and efficiency in the judicial process and prevent relitigation of the same issue in a case. This Court has the power to reconsider and correct erroneous rulings in exceptional circumstances and where reliance on the previous decision would result in manifest injustice, notwithstanding that such rulings have become law of the case.
Mills v. Moore, 786 So.2d 532, 545 (Fla. 2001) (Pariente, J., dissenting) (quoting State v. Owen, 696 So.2d 715, 720 (Fla. 1997)).
In Mills, I concluded that the law of the case doctrine should not preclude us from determining that a death sentence had been erroneously affirmed under the Tedder standard:
The undeniable fact is that a proper and consistent application of Tedder ... would result in this Court honoring the jury's recommendation of life and therefore requires that we revisit our prior ruling in this case. The issue in this case is whether the doctrine of the law of the case precludes our revisiting the jury override issue. I conclude that it does not because it would be a manifest injustice for Mills to be executed when, under identical circumstances, he would not be executed if this Court had reviewed his sentence at any time after 1985. Contrary to Justice Harding's assertion in his concurrence, a proper and consistent application of Tedder does not result in our making "new law on a case-by-case basis in order to reach a desired result." Rather, a proper and consistent application of our long-standing Tedder analysis mandates that we reduce Mills' sentence to life in order to fulfill "our responsibility to apply the law uniformly in all cases, regardless of the status of the players or the stakes of the game." It is precisely because this Court has openly acknowledged in Cochran v. State, 547 So.2d 928, 933 (Fla.1989), that it did not properly and "uniformly" apply Tedder to Mills and other defendants, that we are urged to correct our mistake now before a life is taken based on that mistake.
Mills, 786 So.2d at 545 (Pariente, J., dissenting) (citations omitted). Consistent with my views in Mills, I believe that adherence to the Tedder standard for review of the judicial override of a life recommendation takes precedence over the *1142 doctrine of law of the case and requires that we reduce Marshall's sentence to life.
ANSTEAD, J., dissenting.
Today, we approve a practice that has now been outlawed in the United States by this nation's highest court, the imposition of the death penalty by a single judge in the face of a jury finding that the circumstances of the case do not support a sentence of death and require a life sentence. Because this outcome essentially allows a trial judge to ignore a jury's actions and direct a verdict and judgment for death in favor of the State, it is patently offensive to our constitutional notions of due process and the right to a jury trial.[13]
In Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the Supreme Court explained that although entrusting a judge to find facts necessary to support a death sentence might be an efficient scheme for a society that is prepared to leave criminal justice to the State, "[t]he founders of the American Republic were not prepared to leave it to the State, which is why the jury trial guarantee was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free." Id. at 607, 122 S.Ct. 2428 (quoting Apprendi v. New Jersey, 530 U.S. 466, 498, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (Scalia, J., concurring)). In his opinion in Ring, Justice Scalia specifically warned that despite the Sixth Amendment's vital importance to the founders of this country:
[O]ur people's traditional belief in the right of trial by jury is in perilous decline. That decline is bound to be confirmed, and indeed accelerated, by the repeated spectacle of a man's going to his death because a judge found that an aggravating factor existed. We cannot preserve our veneration for the protection of the jury in criminal cases if we render ourselves callous to the need for that protection by regularly imposing the death penalty without it.
Id. at 612, 122 S.Ct. 2428 (Scalia, J., concurring). Today, the right to a jury trial guaranteed by our founding fathers has suffered a drastic setback in Florida.[14]
I am gravely concerned that the majority's opinion in the instant case hastens the erosion of our traditional veneration for the right to trial by jury in Florida. In short, the majority's decision eviscerates the Sixth Amendment by allowing the death sentence to be imposed based solely on a judge's findings, even though a jury *1143 has clearly found that the defendant should live. For the reasons set forth below, I conclude that Florida's death sentencing scheme, and especially its provision for a judge override of a jury finding, violates the Sixth Amendment and is unconstitutional as applied in this case.

RING and FURMAN

As I have previously stated, I believe that the United States Supreme Court's decision in Ring is clearly the most significant death penalty decision since the Court's seminal decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). See Bottoson v. Moore, 833 So.2d 693, 703 (Fla.2002) (Anstead, C.J., concurring in result only). In fact, the Supreme Court's decision in Ring represents the convergence of two separate lines of cases involving important constitutional safeguards in death penalty jurisprudence.[15]
The first set of safeguards sprang from the Supreme Court's Furman decision and subsequent cases which held that the Eighth Amendment requires states to adopt safeguards protecting against arbitrary and capricious impositions of the death sentence. See, e.g., Loving v. United States, 517 U.S. 748, 755, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996); Gregg v. Georgia, 428 U.S. 153, 176-78, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Proffitt v. Florida, 428 U.S. 242, 252-53, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). As a result of Furman and its progeny, states began "adopt[ing] various narrowing factors that limit the class of offenders upon which the sentencer is authorized to impose the death penalty." Sawyer v. Whitley, 505 U.S. 333, 341-42, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).[16] These narrowing factors are usually set out in a list of aggravating factors that might be utilized in sentencing in cases where the death penalty is authorized as a permissible and possible sanction.
The second line of cases is based on the Sixth Amendment right to a trial by jury *1144 and the extent to which the Sixth Amendment requires a jury, and not a judge, to determine the existence of any facts necessary to sentence an individual for an enhanced crime. See Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). In rejecting Arizona's argument that judges could determine the existence of the facts necessary to permit a sentence of death, the U.S. Supreme Court in Ring commented on how the Eighth and Sixth Amendment lines of cases complement one another, first by reiterating the states' responses to Furman:
States have constructed elaborate sentencing procedures in death cases, Arizona emphasizes, because of constraints we have said the Eighth Amendment places on capital sentencing. Brief for Respondent 21-25 (citing Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam)); see also Maynard v. Cartwright, 486 U.S. 356, 362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) ("Since Furman, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action."); Apprendi, 530 U.S., at 522-23, 120 S.Ct. 2348 (Thomas, J., concurring) ("[I]n the area of capital punishment, unlike any other area, we have imposed special constraints on a legislature's ability to determine what facts shall lead to what punishmentwe have restricted the legislature's ability to define crimes.").
Ring, 536 U.S. at 606, 122 S.Ct. 2428. The Court then went on to expressly reject "[t]he notion `that the Eighth Amendment's restriction on a state legislature's ability to define capital crimes should be compensated for by permitting States more leeway under the Fifth and Sixth Amendments in proving an aggravating fact necessary to a capital sentence.'" Id. (quoting Apprendi, 530 U.S. at 539, 120 S.Ct. 2348 (O'Connor, J., dissenting)). The Court noted that in various settings it had "interpreted the Constitution to require the addition of an element or elements to the definition of a criminal offense in order to narrow its scope." Id. The Court concluded that "[i]f a legislature ... add[ed an] element we held constitutionally required, surely the Sixth Amendment guarantee would apply to that element. We see no reason to differentiate capital crimes from all others in this regard." Id. at 607, 122 S.Ct. 2428.
Under Florida's death penalty scheme, the aggravating factors or elements necessary to impose the death penalty are found at the penalty phase of the trial, after a jury has determined general guilt of the underlying offense. See §§ 775.082, 782.084, 921.141(3), Fla. Stat. (1989). Hence, the narrowing functions required by the Eighth Amendment occur during the penalty phase, which under Florida's statutory scheme expressly directs that a judge rather than the jury determine the existence of aggravating factors necessary for a death sentence to be imposed. Because of the way Florida's statutory death sentencing scheme is written and operates to vest this authority in a judge rather than a jury, it directly conflicts with these two lines of Supreme Court cases, especially to the extent that it allows a judge to override a jury's recommendation in favor of life.

INVALIDITY OF OVERRIDE UNDER RING

While I have consistently disagreed with this Court's refusal to apply the Sixth *1145 Amendment requirements laid out in Apprendi and Ring, and have previously written to voice my disagreement with the Court's failure to make an honest assessment of how Apprendi and Ring impact Florida's death penalty jurisprudential landscape,[17] it is inescapable that Ring precludes the decision that the majority reaches today. As Justice Lewis has eloquently declared:
Based upon the foregoing, although I concur in the result, I cannot concur in the silent reasoning provided by the majority as a basis for its conclusions. As detailed above, I am gravely concerned regarding the constitutionality of jury overrides under Ring and I cannot silently afford blind adherence to authorities which are now in apparent irreconcilable conflict with Ring. Additionally, I also conclude that Florida's standard jury instructions need immediate attention. In my view, there are more than mere contentions of conflict, which the majority is willing to acknowledge, there are facially irreconcilable conflicts which the majority does not acknowledge.
Bottoson v. Moore, 833 So.2d 693, 734 (Fla. 2002) (Lewis, J., concurring in result only). Today, Justice Lewis's concerns have come true in an actual case where a jury's finding has been voided by a judge and the majority has approved that override.
Rather than determine what role the jury should be playing in Florida in order to comply with Ring and the Sixth Amendment, the majority essentially eviscerates the role of a jury in identifying the facts necessary to sentence an individual to death.[18] The majority ignores the fact that the Eighth Amendment procedural protections built into Florida's sentencing scheme occur at the penalty phase of the trial. Instead of considering what happened at the penalty phase of the trial, and the inconvenient fact that the jury found that Marshall should be given a life sentence, the majority erroneously equates the existence of Marshall's prior violent felonies with a finding of the facts necessary to impose the death sentence.

A JUDGE'S OVERRIDE
Regardless of whether a majority of this Court has concluded that Ring does not apply in Florida, we cannot simply ignore the constitutional legal principles discussed in the Ring opinion and our obligation to determine whether any of those constitutional principles impact Florida's death penalty scheme. Perhaps the most visible flaw in Florida's sentencing scheme is its provision allowing a judge to override a jury's finding that sufficient circumstances do not exist to justify imposition of a sentence of death. As noted above, authorizing such an override is tantamount to authorizing a judge to set aside a jury's verdict of not guilty and the imposition of a directed verdict and judgment of death in favor of the State by the judge. Ironically, *1146 the State has frequently asserted in this Court that it is the jury's action in recommending death that "saves" Florida's death scheme under the constitutional analysis in Ring. In other words, the State has asserted that the jury's recommendation of death is tantamount to a finding by the jury of sufficient aggravation to authorize death. However, that argument (even accepting its validity for purposes of further analysis), is completely undermined when a judge is allowed to trump a jury's recommendation of life since in such instance there can be no implication that the jury found aggravating circumstances at all.
A recitation of the circumstances and history of the instant case vividly illustrates how Florida's death sentencing scheme violates the Sixth Amendment. Marshall was charged in an indictment which stated that he unlawfully killed the victim in this case "with premeditated design and/or while engaged in the perpetration of a felony [burglary]."[19] Upon conviction, the jury's general verdict form simply stated that the jury found Marshall guilty of first-degree murder. There is no indication as to whether this conviction was for premeditated murder under section 782.04(1)(a)(1), or felony murder under section 782.04(1)(a)(2), or both. Thus, the jury's guilt phase verdict provides no guidance whatsoever as to whether the facts necessary to sentence Marshall to death were present, let alone proven beyond a reasonable doubt.
More importantly, at this stage of the proceedings no aggravating circumstances or elements necessary to impose the death sentence had been found beyond a reasonable doubt, and thus no narrowing under the Eighth Amendment had occurred. Stated differently, at this stage of the proceedings, without a finding of any aggravating circumstances necessary to impose the death sentence, Marshall stood in the same position as all other defendants convicted of first-degree murder, including those individuals whose crimes did not warrant the death penalty. See generally §§ 775.082, 782.084(1)(b), Fla. Stat. (1987) (indicating that upon conviction of first-degree murder, the procedures in section 921.141, Florida Statutes must be followed in order to determine sentence of death or life imprisonment).
Following the penalty phase proceedings, the jury gave its advisory recommendation pursuant to section 921.141(2), Florida Statutes (1989), that Marshall should be given a sentence of life in prison. Given the recommendation in favor of life, the jury obviously found that the evidence was insufficient to demonstrate the presence of aggravating circumstances that outweighed the mitigating circumstances,[20] if we are to assume, as we must, that the jury followed the standard instructions given in accord with Florida's death penalty scheme. However, after receipt of the jury's recommendation, the trial judge, pursuant to section 921.141(3), Florida Statutes (1989), went on to make his own findings in support of the death sentence and he imposed a sentence of death contrary to the jury's findings and recommendation.[21] *1147 Hence the override of the jury's contrary determinations as to aggravation and mitigation.
In short, to the extent that the jury participated in the process by which Marshall was sentenced to death, it rendered an advisory recommendation in favor of life. The judge acting as the sole fact-finder of the aggravating circumstances then rejected the jury's findings and sentenced Marshall to death. This is simply the way in which Florida's death sentencing scheme is written in the statutes and the way it operates. However, under Ring, this type of judicial fact-finding is unconstitutional.

SPAZIANO, RODRIGUEZ DE QUIJAS, and "EXEMPT" AGGRAVATING CIRCUMSTANCES
To date, this Court has consistently avoided directly confronting the question of Ring's application. The Court has consistently relied on the plurality opinions in Bottoson v. Moore, 833 So.2d 693 (Fla. 2002), and King v. Moore, 831 So.2d 143 (2002), even though neither plurality opinion resolved any of the questions about how Ring should apply or analyzed the potential problems with Florida's statute in any detail.[22] As Justice Lewis has noted, the majority in those cases relied on "silent reasoning." Bottoson v. Moore, 833 So.2d 693, 734 (Fla.2002) (Lewis, J., concurring in result only). In addition to this repeated unelaborated reference to those plurality opinions, the majority today relies on two other grounds for denying relief, as well as its recent decision in Johnson on retroactivity.
First, the majority relies on the existence of the prior violent felony aggravating circumstance. I have written extensively on this matter in previous opinions,[23] and will not repeat my views at length here. Nevertheless, I would reiterate that the death sentence in this case was based solely on the judge's override of the jury's findings that insufficient circumstances existed to impose a death penalty. In other words, the death sentence here is expressly predicated upon practice expressly outlawed in Ring: one judge's findings contrary to the findings of a jury.
The majority also relies on the Supreme Court's comment in Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), that courts faced with conflicting Supreme Court decisions should "follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Id. at 484, 109 S.Ct. 1917. Of course, as everyone must acknowledge, and as I have noted before, the U.S. Supreme Court has not yet directly answered the question of whether Florida's death sentencing scheme violates the Sixth Amendment pursuant to the reasoning in Ring and Apprendi. See Duest, 855 So.2d at 57 (Anstead, C.J., concurring in part and dissenting in part). However, the majority alleges that we are precluded from *1148 applying Ring under the Rodriguez de Quijas reasoning because the Supreme Court has previously upheld Florida's death sentencing scheme against a Sixth Amendment challenge in Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). I do not believe that the majority's reliance on Spaziano is well placed. The Supreme Court has specifically stated that the decision in Spaziano did not involve the type of Sixth Amendment challenge brought in Ring and Apprendi. See Jones v. United States, 526 U.S. 227, 250, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (explaining, in a case that was the precursor to Apprendi and Ring, that Spaziano "contains no discussion of the sort of fact-finding before us in this case. It addressed the argument that capital sentencing must be a jury task and rejected that position on the ground that capital sentencing is like sentencing in other cases, being a choice of the appropriate disposition, as against an alternative or a range of alternatives"); see also King v. Moore, 831 So.2d 143, 152 (Fla.2002) (explaining that "the defendant in Spaziano never based his Sixth Amendment argument on the premise that aggravating factors must be found by a jury beyond a reasonable doubt") (Pariente, J., concurring in result only).
Nevertheless, even if we construe Spaziano as precluding our ability to give relief based on Ring, we should at least be clear as to the tension between the two opinions. Although the basis for the Rodriguez de Quijas admonition was rooted in the important and long-standing concept of stare decisis and the supremacy clause of the constitution, we are not required to blind ourselves to Supreme Court decisions that do not directly speak to our Court or to sit silent in the face of changes in the law. When we are faced with the tension between whether we should be faithful to what may be doubtful precedent in an old line of cases or whether we should follow the law as developed in newer and more recent cases, at the very least we should set out the tension that exists.
At a minimum, for example, the majority should not ignore Justice Lewis's good-sense observations in Bottoson:
[W]e should acknowledge that although decisions such as Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), have not been expressly overruled, at least that portion of Spaziano which would allow trial judges to override jury recommendations of life imprisonment in the face of Sixth Amendment challenges must certainly now be of questionable continuing vitality. Spaziano viewed jury participation through the prism of sentencing, a framework now removed from the analysis adopted in Ring. . . .
... While I certainly understand and respect the principle that the United States Supreme Court has reserved for itself "the prerogative of overruling its own decisions," Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (quoting Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)), I conclude that a logical reading and comparison of the texts of the Spaziano and Ring opinions produces an inescapable conflict. Thus, just as "Walton and Apprendi are irreconcilable," Ring, 536 U.S. at 609, 122 S.Ct. at 2443, the portions of Spaziano which conflict with the explicit conclusions of Ring are, at best, of dubious continuing vitality.
Bottoson, 833 So.2d at 725-26 (Lewis, J., concurring in result only). Indeed, given the acknowledged correctness of the principles set out in Ring, this Court has an independent obligation to apply those principles *1149 in Florida. Justice Lewis has already provided us with an appropriate framework for doing so in his opinion in Bottoson.
Moreover, I do not believe that the Supreme Court implied that its Ring decision should be construed so narrowly that it only applies to Arizona. In addition to Arizona, the Ring decision listed a number of states where capital sentencing fact-finding was performed solely by judges, as well as so-called "hybrid" states like Florida. See Ring, 536 U.S. at 608 n. 6, 122 S.Ct. 2428. (listing Colorado, Idaho, Montana and Nebraska as having schemes similar to Arizona, and Alabama, Delaware, Florida and Indiana as "hybrid" systems).[24] Except for Florida and Alabama, all of the states identified in Ring as having sentencing schemes that potentially violate the Sixth Amendment have openly confronted the unconstitutional portions of their state's death sentencing schemes in case law or legislation.[25]

Prior Case Law
Perhaps most importantly, the majority's position also directly conflicts with our own previous precedent, since we have never used the comment from Rodriguez de Quijas to justify disregarding important decisions from the U.S. Supreme Court. In fact, we have consistently acted to the contrary, and always attempted to apply such decisions to Florida, even when these decisions involved the U.S. Supreme Court's review of death sentencing procedures from other states.[26] In other words, the majority has no legitimate cover to *1150 support its refusal to acknowledge the legal principles established in Ring. The lesson to be garnered from our precedent is that we have never allowed the fact that an important Supreme Court decision did not directly address Florida's death penalty scheme to relieve us of the obligation to apply its holding in Florida.[27]

RETROACTIVITY
Having concluded that Florida's jury override scheme is impermissible under Ring, I would also affirmatively state that Ring should be retroactively applied in this case. To a large extent, I addressed my views on the question of Ring's retroactivity in my dissenting opinions in Hughes v. State, 901 So.2d 837 (Fla. 2005), and Johnson v. State where I concluded that Ring and Apprendi should be applied retroactively, since we have applied numerous other Supreme Court death penalty decisions retroactively.[28] Nevertheless, as I stated in Hughes, by our consistency in addressing the merits of Apprendi and Ring claims in postconviction cases, the Court has implicitly held that Ring has retroactive effect. See Hughes v. State, 901 So.2d at 855-56 and note 21 (Anstead, J., dissenting).
*1151 To determine whether Ring should have retroactive effect, it is necessary for the Court to apply the test this Court long ago established for determining retroactivity in Witt v. State, 387 So.2d 922 (Fla.1980). The Witt test is comprised of three elements: (1) a change of law that emanates either from this Court or the United States Supreme Court; (2) is constitutional in nature; and (3) has fundamental significance. See Witt, 387 So.2d at 931. Under the third prong of the Witt test, the Court will consider a decision of fundamental significance if it places beyond the authority of the state the power to regulate certain conduct or impose certain penalties or if it meets the three so-called Stovall/Linkletter factors.[29]Witt, 387 So.2d at 926. Those factors are: "(a) the purpose to be served by the new rule; (b) the extent of reliance on the old rule; and (c) the effect on the administration of justice of a retroactive application of the new rule." Id. at 926.[30] Clearly, Ring satisfies the first two prongs of the Witt test as it emanated from the United States Supreme Court and it dealt with the constitutional protections in the Sixth Amendment. Therefore, the case would turn on the third prong of the Witt test.
Arguably, Ring is a decision of fundamental significance because it prevents states from exercising the death penalty where the facts necessary to impose the penalty were found by a judge alone. The Court clearly viewed the Ring decision as one of fundamental significance. In going through the history leading up to the decision that Apprendi and Walton were irreconcilable and overruling Walton, the Court quoted at length from Justice Stevens' dissent in Walton, wherein he explained the historical significance of the Sixth Amendment requirement that juries find the facts necessary to impose the death sentence:
In dissent in Walton, Justice Stevens urged that the Sixth Amendment requires "a jury determination of facts that must be established before the death penalty may be imposed." [Walton, 497 U.S.], at 709, 110 S.Ct. 3047. Aggravators "operate as statutory `elements' of capital murder under Arizona law," he reasoned, "because in their absence, [the death] sentence is unavailable." Id., at 709, n. 1, 110 S.Ct. 3047 "If th[e] question had been posed in 1791, when the Sixth Amendment became law," Justice Stevens said, "the answer would have been clear," for [b]y that time,
"the English jury's role in determining critical facts in homicide cases was entrenched. As fact-finder, the jury had the power to determine not only whether the defendant was guilty of homicide but also the degree of the offense. Moreover, the jury's role in finding facts that would determine a homicide defendant's eligibility for capital punishment was particularly well established. Throughout its history, *1152 the jury determined which homicide defendants would be subject to capital punishment by making factual determinations, many of which related to difficult assessments of the defendant's state of mind. By the time the Bill of Rights was adopted, the jury's right to make these determinations was unquestioned."

Id., at 710-11, 110 S.Ct. 3047(quoting White, Fact-Finding and the Death Penalty: The Scope of a Capital Defendant's Right to Jury Trial, 65 Notre Dame L.Rev. 1, 10-11 (1989)).
Ring, 536 U.S. at 599, 122 S.Ct. 2428. Additionally, in explaining that the Sixth Amendment requires the jury to find aggravating circumstances when they operate as the functional equivalent of a greater offense, the Supreme Court specifically declared: "The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the fact-finding necessary to increase a defendant's sentence by two years, but not the fact-finding necessary to put him to death." Ring, 536 U.S. at 609, 122 S.Ct. 2428. Therefore, the Supreme Court was undeniably aware of the fundamental significance of its decision in Ring.
Ring should also be treated retroactively when the three Stovall/Linkletter factors are considered, i.e., (a) the purpose to be served by the new rule; (b) the extent of reliance on the old rule; and (c) the effect on the administration of justice of a retroactive application of the new rule.[31] First, as illustrated by the quotations above, the purpose of the rule in Ring is of paramount importancethe rule is meant to safeguard an individual's Sixth Amendment rights. Second, to the extent that the prior rule at issue in this case was utilized, it was only applied to those individuals who were sentenced to death by a judge's factual findings after a jury had recommended a life sentence.[32] And third, the impact on administration of justice would be minimal. The number of individuals currently on death row because a judge chose to override the jury's recommendation in favor of life is minimal. Moreover, because of well-established double jeopardy precepts, these individuals would not need additional sentencing proceedings because their death sentences would be commuted to life. Cf. Wright v. State, 586 So.2d 1024, 1032 (Fla.1991) (stating that "when it is determined on appeal that the trial court should have accepted a jury's recommendation of life imprisonment pursuant to Tedder[ v. State, 322 So.2d 908 (Fla.1975) ], the defendant must be deemed acquitted of the death penalty for double jeopardy purposes").
More importantly, I find it untenable that collateral claimants would not be entitled to make any claim based on Ring's holding on procedural retroactivity grounds. The idea that individuals with cases decided after Ring are entitled to their Sixth Amendment rights, but those who were sentenced before Ring are not, is troubling. Of course, I realize the value of finality and do not believe that every decision warrants retroactive relief. However, *1153 as noted in Witt, the doctrine of finality is not inviolable:
The doctrine of finality should be abridged only when a more compelling objective appears, such as ensuring fairness and uniformity in individual adjudications. Thus, society recognizes that a sweeping change of law can so drastically alter the substantive or procedural underpinnings of a final conviction and sentence that the machinery of post-conviction relief is necessary to avoid individual instances of obvious injustice. Considerations of fairness and uniformity make it very "difficult to justify depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases."

Witt, 387 So.2d at 925 (emphasis added). In stark contrast to our charge in Witt, the majority today is ignoring fairness and uniformity and committing an obvious injustice by depriving Marshall of his life under a process that is not acceptable and that will no longer be applied in the future. As Justice Stewart noted in his oft-quoted opinion in Furman:
The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.
Furman v. Georgia, 408 U.S. at 306, 92 S.Ct. 2726 (Stewart, J., concurring). The need for finality of the case must be weighed against the finality of the punishment to be meted out. As Justice Scalia stated in Ring, our traditional belief in the right to trial by jury is undermined by "the repeated spectacle of a man's going to his death because a judge found that an aggravating factor existed." Ring v. Arizona, 536 U.S. at 612, 122 S.Ct. 2428 (Scalia, J., concurring).

CONCLUSION
Clearly, Ring was a decision meant to increase the consistency and accuracy of identifying those cases where the death penalty is warranted by requiring the facts necessary to impose the death sentence to be found by the jury. The Court's decision today flies directly in the face of the Sixth Amendment and the Supreme Court's decision in Ring. Rather than embrace the Sixth Amendment's protections and look for ways in which the role of the jury could be modified to bring Florida into line with the Supreme Court's prevailing constitutional law, the majority has effectively removed the jury from the death penalty equation.[33] This is a sad day for constitutional law and justice in the State of Florida.
NOTES
[1] The trial court found the following four aggravating circumstances: (1) the murder was committed by a person under sentence of imprisonment; (2) the defendant was previously convicted of violent felonies; (3) the murder was committed while the defendant was engaged in the commission of or an attempt to commit a burglary; and (4) the murder was especially heinous, atrocious, or cruel (HAC). In mitigation, the trial court found that the defendant's behavior at trial was acceptable and that the defendant entered prison at a young age. The trial court, however, specifically rejected as mitigation that the defendant's older brother influenced him and led him astray to run the streets and break the law, and that his mother caused him to believe he would suffer no negative consequences for his bad behavior. See id.
[2] In our previous opinion, we rejected a similar claim of ineffective assistance of trial counsel, noting that trial counsel's performance was not deficient pursuant to the test in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Marshall v. State, 854 So.2d 1235, 1248 (Fla.2003).
[3] See Bates v. State, 750 So.2d 6, 15-17 (Fla. 1999) (holding trial court did not violate Ake by refusing to appoint additional experts to evaluate MRI results where court-appointed expert opined defendant suffered from organic brain damage, defense counsel claimed MRI would not show this functional brain damage, and MRI results revealed no presence of organic brain damage); see also Rose v. State, 506 So.2d 467, 471 (Fla. 1st DCA 1987) (concluding trial court did not abuse its discretion in refusing to appoint additional experts where several experts had been previously appointed); cf. Morgan v. State, 639 So.2d 6, 11-12 (Fla.1994) (concluding that denial of defendant's request for additional experts on grounds that experts were biased was error, but harmless given that at least five experts had been previously retained to aid in defense); but see Cade v. State, 658 So.2d 550, 555 (Fla. 5th DCA 1995) (holding trial court abused its discretion in denying defendant's motion for appointment of DNA expert given the central importance of DNA evidence to the State's case); Dingle v. State, 654 So.2d 164, 167 (Fla. 3d DCA 1995) (concluding trial court abused its discretion in denying defendant's motion for additional experts which were sought to rebut the State's evidence concerning the timing of the victim infant's injuries).
[4] In his original habeas petition, Marshall argued that the death penalty is unconstitutional as applied to him in light of the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). After Marshall's petition was filed, the United States Supreme Court issued its opinion in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which applied the Apprendi decision to death penalty cases. Subsequently, in the plurality decisions in Bottoson v. Moore, 833 So.2d 693, 695 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002), this Court addressed the application of Ring in Florida, and while there was no single majority view expressed in either case, this Court denied relief. After the release of Bottoson and King, we allowed supplemental filings by Marshall and the State on this issue.
[5] See, e.g., Robinson v. State, 865 So.2d 1259 (Fla.2004); Smith v. State, 866 So.2d 51 (Fla. 2004); Parker v. State, 873 So.2d 270 (Fla. 2004); Guzman v. State, 868 So.2d 498 (Fla. 2003); Davis v. State, 875 So.2d 359 (Fla. 2003); Zakrzewski v. State, 866 So.2d 688 (Fla.2003); Henry v. State, 862 So.2d 679, 681 (Fla.2003); Owen v. State, 862 So.2d 687, 704 (Fla.2003); Johnston v. State, 863 So.2d 271, 286 (Fla.2003), cert. denied, 541 U.S. 946, 124 S.Ct. 1676, 158 L.Ed.2d 372 (2004); Cummings-El v. State, 863 So.2d 246, 253 (Fla. 2003); Anderson v. State, 863 So.2d 169, 189 (Fla.2003), cert. denied, 541 U.S. 940, 124 S.Ct. 1662, 158 L.Ed.2d 363 (2004); Jones v. State, 855 So.2d 611, 619 (Fla.2003); Rivera v. State, 859 So.2d 495, 508 (Fla.2003); Davis v. State, 859 So.2d 465, 480 (Fla.2003); Stewart v. State, 872 So.2d 226 (Fla.2003); Conde v. State, 860 So.2d 930, 959 (Fla.2003), cert. denied, 541 U.S. 977, 124 S.Ct. 1885, 158 L.Ed.2d 475 (2004); McCoy v. State, 853 So.2d 396, 409 (Fla.2003); Owen v. Crosby, 854 So.2d 182, 193 (Fla.2003); Fennie v. State, 855 So.2d 597, 611 (Fla.2003), cert. denied, 541 U.S. 975, 124 S.Ct. 1877, 158 L.Ed.2d 471 (2004); Caballero v. State, 851 So.2d 655, 664 (Fla.2003); Nelson v. State, 850 So.2d 514, 533 (Fla.2003), cert. denied, 540 U.S. 1091, 124 S.Ct. 961, 157 L.Ed.2d 797 (2003); Belcher v. State, 851 So.2d 678, 685 (Fla. July 10, 2003); Allen v. State, 854 So.2d 1255, 1262 (Fla.2003); Wright v. State, 857 So.2d 861, 878 (Fla.2003), 541 U.S. 961, 124 S.Ct. 1715, 158 L.Ed.2d 402 (2004); Blackwelder v. State, 851 So.2d 650, 653 (Fla. 2003); Duest v. State, 855 So.2d 33, 49 (Fla. 2003); Cooper v. State, 856 So.2d 969, 977 (Fla.2003), cert. denied, 540 U.S. 1222, 124 S.Ct. 1512, 158 L.Ed.2d 159 (2004); Pace v. State, 854 So.2d 167, 172 (Fla.2003), cert. denied, 540 U.S. 1153, 124 S.Ct. 1155, 157 L.Ed.2d 1049 (2004); Butler v. State, 842 So.2d 817, 834 (Fla.2003); Harris v. State, 843 So.2d 856, 870 (Fla.2003); Lawrence v. State, 846 So.2d 440, 456 (Fla.2003); Banks v. State, 842 So.2d 788, 793 (Fla.2003); Grim v. State, 841 So.2d 455, 465 (Fla.2003); Lugo v. State, 845 So.2d 74, 119 (Fla.2003); Jones v. State, 845 So.2d 55, 74 (Fla.2003); Kormondy v. State, 845 So.2d 41, 54 (Fla.2003); Doorbal v. State, 837 So.2d 940, 963 (Fla. 2003); Anderson v. State, 841 So.2d 390, 408 (Fla.2003); Cole v. State, 841 So.2d 409, 431 (Fla.2003); Conahan v. State, 844 So.2d 629, 642 (Fla.2003); Spencer v. State, 842 So.2d 52, 72 (Fla.2003); Porter v. Crosby, 840 So.2d 981, 987 (Fla.2003); Lynch v. State, 841 So.2d 362, 366 (Fla.2003); Lucas v. State, 841 So.2d 380, 389 (Fla.2003); Fotopoulos v. State, 838 So.2d 1122, 1136 (Fla.2002); Israel v. State, 837 So.2d 381, 394 (Fla.2002); Bruno v. Moore, 838 So.2d 485, 492 (Fla.2002); Marquard v. State, 850 So.2d 417, 431 (Fla. 2002); Chavez v. State, 832 So.2d 730, 767 (Fla. Nov.21, 2002); Washington v. State, 835 So.2d 1083, 1091 (Fla.2002); Bottoson v. Moore, 833 So.2d 693, 694 (Fla.2002); King v. Moore, 831 So.2d 143, 144 (Fla.2002).
[6] See, e.g., Smith v. State, 866 So.2d 51, 68 (Fla.2004) (denying relief on Ring claim and "specifically not[ing] that one of the aggravating factors present in this matter is a prior violent felony conviction"); Davis v. State, 875 So.2d 359, 374 (Fla.2003) (stating that "[w]e have denied relief in direct appeals where there has been a prior violent felony aggravator"); Johnston v. State, 863 So.2d 271, 286 (Fla.2003) (stating that the existence of a "prior violent felony conviction alone satisfies constitutional mandates because the conviction was heard by a jury and determined beyond a reasonable doubt"), cert. denied, 541 U.S. 946, 124 S.Ct. 1676, 158 L.Ed.2d 372 (2004); Henry v. State, 862 So.2d 679, 687 (Fla.2003) (stating in postconviction case that this Court has previously rejected Ring claims "in cases involving the aggravating factor of a previous violent felony conviction"); see also Rivera v. State, 859 So.2d 495, 508 (Fla.2003); Jones v. State, 855 So.2d 611, 619 (Fla.2003); Conde v. State, 860 So.2d 930, 959 (Fla.2003), cert. denied, 541 U.S. 977, 124 S.Ct. 1885, 158 L.Ed.2d 475 (2004); Belcher v. State, 851 So.2d 678, 685 (Fla. 2003), cert. denied, 540 U.S. 1054, 124 S.Ct. 816, 157 L.Ed.2d 706 (2003); Blackwelder v. State, 851 So.2d 650, 654 (Fla.2003); Duest v. State, 855 So.2d 33, 49 (Fla.2003), cert. denied, 541 U.S. 993, 124 S.Ct. 2023, 158 L.Ed.2d 500 (2004); Grim v. State, 841 So.2d 455, 465 (Fla.2003); Jones v. State, 845 So.2d 55, 74 (Fla.2003); Lugo v. State, 845 So.2d 74, 119 n. 79 (Fla.2003); Doorbal v. State, 837 So.2d 940, 963 (Fla.2003).
[7] Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
[8] Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984).
[9] Cf. Apprendi, 530 U.S. at 538, 120 S.Ct. 2348 (O'Connor, J., dissenting) (terming the majority's reasoning in Apprendi "baffling, to say the least").
[10] Witt v. State, 387 So.2d 922 (Fla.1980).
[11] See id. at 926 (holding that the retroactivity of a new rule of law may be determined by assessing (a) the purpose served by the new rule; (b) the extent of reliance on the old rule; and (c) the effect on the administration of justice of retroactive application of the new rule).
[12] See DeStefano, 392 U.S. at 633, 88 S.Ct. 2093 (explaining that the "purpose" served by a new rule of law is one of three factors for determining retroactivity under Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and then holding that "[a]ll three factors favor only prospective application" of the jury-trial guarantee to the states).
[13] I acknowledge that this Court has now ruled that Ring will not be applied retroactively in Florida. See Johnson v. State, 904 So.2d 400 (Fla. 2005).
[14] It is truly tragic to see how far respect has diminished for one of the two most important and fundamental rights vouchsafed for us by our founding fathers, the first being the right to vote, the second being the right to trial by jury. The importance of this right was described by the U.S. Supreme Court in Jones v. United States, 526 U.S. 227, 246, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), where the Court said:

Identifying trial by jury as "the grand bulwark" of English liberties, Blackstone contended that other liberties would remain secure only "so long as this palladium remains sacred and inviolate, not only from all open attacks, (which none will be so hardy as to make) but also from all secret machinations, which may sap and undermine it; by introducing new and arbitrary methods of trial, by justices of the peace, commissioners of the revenue, and courts of conscience. And however convenient these may appear at first (as doubtless all arbitrary powers, well executed, are the most convenient), yet let it be again remembered, that delays, and little inconveniences in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters." [4 William Blackstone, Commentaries] at 342-344.
Jones v. United States, 526 U.S. 227, 246, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).
[15] Furman, of course, was applied universally and retroactively to all state death penalty schemes in the United States, even though the case was decided by a plurality decision. See, e.g., Gregg v. Georgia, 428 U.S. 153, 179-180, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (noting that thirty-five states had enacted new death penalty statutes in response to the Court's decision in Furman); Schick v. Reed, 419 U.S. 256, 270, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974) (Marshall, J., dissenting) (stating that Furman's retroactivity is "unclouded" and noting that the Court had not hesitated in giving "full retroactive effect to the Furman decision"); Robinson v. Neil, 409 U.S. 505, 508, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973) (recognizing that the Court had not hesitated in applying Furman retroactively); Summerlin v. Stewart, 341 F.3d 1082, 1103 (9th Cir. 2003) (stating that "[t]here was no doubt, importantly, that Furman had retroactive effect"); Joubert v. Hopkins, 75 F.3d 1232, 1242 (8th Cir.1996) (noting that Furman invalidated all death penalty procedures that were in place at the time it was decided).
[16] In Loving, the Court further explained this Eighth Amendment narrowing requirement:

The Eighth Amendment requires, among other things, that "a capital sentencing scheme must `genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (quoting Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)). Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. 484 U.S., at 244, 108 S.Ct., at 554. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process." Id., at 246, 108 S.Ct. 546.
517 U.S. at 755, 116 S.Ct. 1737.
[17] See, e.g., Conde v. State, 860 So.2d 930, 959-960 (Fla.2003) (Anstead, C.J., concurring in part and dissenting in part); Caballero v. State, 851 So.2d 655, 664-65 (Fla.2003) (Anstead, C.J., concurring in part and dissenting in part); Fennie v. State, 855 So.2d 597, 611 (Fla.2003) (Anstead, C.J., concurring in part and dissenting in part); Nelson v. State, 850 So.2d 514, 535 (Fla.2003) (Anstead, C.J., concurring in part and dissenting in part); Duest v. State, 855 So.2d 33, 52-57 (Fla.2003) (Anstead, C.J., concurring in part and dissenting in part); Bottoson v. Moore, 833 So.2d 693, 703-10 (Fla.2002) (Anstead, C.J., concurring in result only).
[18] As demonstrated by the number of cases cited by the majority, the Court has consistently relied upon such exceptions or loopholes to avoid the ambit of Ring's requirements in virtually all of the cases we have reviewed since Ring's release. See supra note 5.
[19] The indictment also listed the crimes charged as violations of sections 782.04(1)(a)(1) "and/or" 782.04(1)(a)(2), Florida Statutes (1987). Section 782.04(1)(a)(1) prohibits premeditated murder and section 782.04(1)(a)(2) deals with murders committed during the perpetration of enumerated felonies.
[20] The U.S. Supreme Court has recognized that Florida's death penalty scheme prevents one from knowing what aggravating circumstances the jury has found. See Sochor v. Florida, 504 U.S. 527, 538, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) (recognizing that "the jury in Florida does not reveal the aggravating factors on which it relies.").
[21] It is worthy to note that Marshall was not charged with the underlying burglary and he was not convicted of burglary by the jury. Therefore, it was necessary for the trial judge to find that the elements of the burglary had been proven as well.
[22] As I have previously pointed out, the opinions in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (2002), where we first addressed Ring, were "only plurality opinions and a majority of justices (four), wrote separate opinions acknowledging that Ring impacted Florida's death penalty scheme in a variety of ways." Duest v. State, 855 So.2d 33, 57 n. 25 (Fla. 2003) (Anstead, C.J., concurring in part and dissenting in part); see also Bottoson v. Moore, 833 So.2d 693, 703-10 (Fla.2002) (Anstead, C.J., concurring in result only).
[23] See supra note 17.
[24] Justice O'Connor also elaborated that Ring's impact was not limited to Arizona. See Ring, 536 U.S. at 620-21, 122 S.Ct. 2428 (noting that the Ring majority "effectively declares five States' capital sentencing schemes unconstitutional" and also creates questions about the sentencing schemes in four other states, including Florida, that would lead to claims filed by prisoners on death row) (O'Connor, J., dissenting).
[25] See Woldt v. People, 64 P.3d 256, 259 (Colo.2003) (holding that Colorado's death penalty statute violated the Sixth Amendment and was unconstitutional under Ring); State v. Gales, 265 Neb. 598, 658 N.W.2d 604, 624 (2003) (holding that jury's failure to explicitly find aggravating circumstance violated Ring and remanding for new sentencing procedure); State v. Fetterly, 137 Idaho 729, 52 P.3d 874, 875 (2002) (concluding that Ring applied to Idaho's death sentencing scheme and it appeared to render Idaho's death sentencing scheme unconstitutional); Brice v. State, 815 A.2d 314, 320 (Del.2003) (explaining that Delaware's General Assembly had revised Delaware's death sentencing scheme in response to Ring and "transformed the jury's role, at the so-called narrowing phase, from one that was advisory under the [pre-Ring version of the statute] into one that is now determinative as to the existence of any statutory aggravating circumstances"); see also Mont.Code Ann. § 46-1-401(1)(a)-(b) (2003) (indicating that sentence enhancing facts must be charged in the indictment and a judge is prohibited from enhancing a sentence unless "the jury unanimously found in a separate finding that the enhancing act, omission, or fact occurred beyond a reasonable doubt"); Ind.Code Ann. § 35-50-2-9(e)(2) (2004) (indicating that if the jury reaches a sentencing recommendation, the judge must sentence the defendant accordingly).
[26] For example, in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the United States Supreme Court upheld Florida's death sentencing statute against an Eighth and Fourteenth Amendment challenge. Since it was decided, Proffitt has remained good law. Nevertheless, we have on numerous occasions applied or relied on decisions from the United States Supreme Court that announced new doctrinal developments in death penalty law based on the Eighth Amendment, despite the fact that these decisions addressed other state's death penalty schemes and did not expressly overrule Proffitt. See, e.g., Allen v. State, 636 So.2d 494, 498 n. 7 (Fla.1994) (noting that Supreme Court's decision in Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) provided support for our conclusion that the Florida Constitution prohibited a death sentence for individuals who were younger than sixteen at the time of their crime); Jackson v. Dugger, 547 So.2d 1197, 1198-99 (Fla.1989) (applying decision in Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) to Florida law); Harvard v. State, 486 So.2d 537 (Fla.1986) (applying decisions in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) to Florida law).
[27] Even if the Court chooses to err on the side of assuming that we are prevented from granting relief in this case until the Supreme Court overrules Spaziano, we should acknowledge, as has Justice Lewis, that Spaziano and Ring are irreconcilable. This is what the Arizona Supreme Court did when faced with the tension between Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). See State v. Ring, 200 Ariz. 267, 25 P.3d 1139, 1150-52 (2001). However, our Court is in a more tenuous position than the Arizona Supreme Court was when it made its decision. In its opinion, the Arizona Supreme Court explained that it was bound to follow the Supreme Court's previous decision upholding Arizona's death sentencing scheme in Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), because, even though there were questions about Walton's continued viability, the Apprendi majority had expressly endorsed Walton and rejected Apprendi's application to capital sentencing schemes. Id. Following the Supreme Court's decision in Ring, we now know that the reasoning in Apprendi does apply to capital sentencing schemes. Moreover, unlike Apprendi, which tacitly endorsed the continued viability of Walton, there is no such endorsement of the previous decisions upholding Florida's sentencing scheme in Ring.
[28] See supra note 26. See also James v. State, 615 So.2d 668, 669 (Fla.1993) (applying retroactively Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), wherein Florida's jury instruction on the "heinous, atrocious, or cruel" aggravating circumstance was held to be impermissibly vague under the Eighth Amendment); Thompson v. Dugger, 515 So.2d 173, 175 (Fla. 1987) (concluding that Hitchcock v. Dugger, 481 U.S. 393, 398-99, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), which held that instruction to advisory jury to not consider nonstatutory mitigation and trial judge's refusal to consider nonstatutory mitigation were improper, should be applied collaterally); State v. White, 470 So.2d 1377, 1379 (Fla.1985) (concluding that Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), which held that it was improper to impose the death penalty on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed," should be applied collaterally); Tafero v. State, 459 So.2d 1034, 1035 (Fla.1984) (determining, under Witt, that Enmund is "such a change in the law as to be cognizable in post-conviction proceedings").
[29] Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).
[30] Justice Shaw has already done a retroactivity analysis under Witt to Ring and found Ring should be applied retroactively:

First, Ring falls within the ambit of Witt, for it emanated from the United States Supreme Court. Second, Ring is constitutional in nature, for its holding goes to the very heart of the constitutional right to trial by jury. And third, Ring is of "fundamental significance," for its purpose is to safeguard the basic protections guaranteed by the right to trial by jury. This Court in the past has applied retroactively other significant decisions of the United States Supreme Court in the capital sentencing area.
Bottoson v. Moore, 833 So.2d 693, 717 (Fla. 2002) (Shaw, J., concurring in result only) (footnote omitted).
[31] I would note that the only state court that has examined Ring under a retroactivity test similar to Florida's has found that Ring should be applied retroactively. See State v. Whitfield, 107 S.W.3d 253, 268 (Mo.2003) (concluding that Ring should apply retroactively under the Stovall/Linkletter test).
[32] Some published accounts have indicated that there are only a small number of individuals in this position. See Brad Smith, A Say in Matters of Life And Death, Tampa Tribune, Dec. 29, 2002, at 1 (stating that "[o]nly 10 of Florida's 366 death row convicts ... were condemned by a judge after a jury recommended life in prison, the state's attorney general's office says").
[33] In addition to my concerns with Marshall's Ring claim, I am troubled by the outcome of his mental health claim as well. In effect, Marshall was never evaluated by a mental health expert as he is entitled to under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Although Marshall was evaluated briefly by Dr. Klass, in this Court's previous opinion we determined that trial counsel was not ineffective for failing to secure an additional expert, despite any shortcomings in Dr. Klass's evaluation, and noted that the issue could have been brought on appeal. See Marshall v. State, 854 So.2d 1235, 1248 (Fla.2003). Even if appellate counsel was not ineffective for failing to raise a claim on appeal, the end result is that Marshall was never closely evaluated. See id. (noting that Marshall's trial counsel did not want to call Dr. Klass to testify "because `he would have been blown out of the water' when the jury learned that he only spent a short time with Marshall").